Argued July 12, 1977, reversed January 31, petition for rehearing allowed, former decision adhered to October 25, 1978

CITY OF LA GRANDE, *Respondent,*
*v.*
PUBLIC EMPLOYES RETIREMENT
BOARD et al, *Petitioners.*
(TC 22993, CA 5943, SC 25230)

CITY OF ASTORIA, *Respondent,*
*v.*
PUBLIC EMPLOYES RETIREMENT
BOARD et al, *Petitioners.*
(TC 29437, CA 6129, SC 25230)

576 P2d 1204

Gary K. Jensen, Eugene, argued the cause and filed a brief for petitioners Policemen and Firemen of the City of Astoria, as a class.

Al J. Laue, Solicitor General, Salem, argued the cause for petitioner Public Employes' Retirement Board of the State of Oregon. With him on the brief were Lee Johnson, Attorney General, and W. Michael Gillette, Solicitor General.

Ross Hearing, La Grande, argued the cause and filed a brief for respondent City of La Grande.

D. Richard Fischer, Astoria, argued the cause for respondent City of Astoria. With him on the brief was

Robert C. Anderson of Anderson, Fulton, Lavis & Van Thiel.

James M. Mattis, Eugene, Special Counsel for amici curiae; Edward C. Harms, Jr., City Attorney, Springfield; J. B. Bedingfield, Jr., City Attorney, Coos Bay; Charles A. Phipps, City Attorney, The Dalles; John H. Hammond, Jr. (Oregon City), City Attorney, Gladstone; J. D. Bailey (Hillsboro), City Attorney, Tigard; L. Charles Purvis (St. Helens), City Attorney, Rainier; and Earl McFarlan, City Attorney, Sweet Home, filed a brief for seven Oregon cities as amici curiae.

LINDE, J.

Tongue, Howell, and Bryson, JJ., separate dissenting opinions.

## LINDE, J.

By a 1971 enactment, the legislative assembly required all police officers and firemen employed by any city, county, or district to be brought within the state's Public Employes Retirement System by July 1, 1973, unless the particular public employer provides them with equal or better retirement benefits. Or Laws 1971, ch 692, *codified at* ORS 237.610-237.640. The same statute also required these public employers to pay the premiums on an insurance policy purchased by the state's Department of General Services, providing $10,000 to an officer's or fireman's beneficiaries in case of his or her job-related death, again unless the employer provides equal or better benefits. ORS 243.005-243.055.

■■ The validity of the retirement provisions of the statute was attacked in separate declaratory judgment proceedings brought by the Cities of La Grande and Astoria against various state officials and against their respective police and firefighters as a class or as represented by their collective bargaining agents.[1] Astoria also challenged the statutory requirement of insurance coverage. The cities claim that by requiring them to provide police officers and firemen with retirement and insurance benefits the legislature has invaded a domain reserved to local discretion by the Oregon Constitution. The respective trial courts

---

[1] A proceeding under chapter 28 must be more than a request for an advisory opinion; as an exercise of the "judicial power," Or Const art VII (am), § 1, it requires identification of the assertedly adverse interest of the named defendants. *Gortmaker v. Seaton,* 252 Or 440, 444, 450 P2d 547 (1969), and cases there cited. Moreover, such proceedings against state agencies often require examination of preliminary issues of ripeness or possibly exhaustion of administrative remedies. *See Oregon Newspaper Pub. Ass'n v. Peterson,* 244 Or 116, 415 P2d 21 (1966); *cf.* ORS 183.400. *See also City of Hermiston v. ERB,* 280 Or 291, 570 P2d 663 (1977), and *State ex rel Haley v. City of Troutdale,* decided today. Finally, the court may have to determine whether all interested parties have been named. ORS 28.110; *Stearns v. Commission of Public Docks,* 240 Or 255, 401 P2d 25 (1965).

In these cases, we conclude that a sufficiently adverse interest exists between the plaintiff cities and the defendant employee groups and state agencies.

agreed with this claim. The Court of Appeals affirmed in a consolidated appeal, 28 Or App 9, 558 P2d 1236 (1977). In granting review, we specifically asked the parties to discuss these questions:

    1. In *State ex rel Heinig v. Milwaukie et al,* 231 Or 473, 373 P2d 680 (1962), this court announced a test to be used in determining when the state can legislate on a matter of local concern. Should the *Heinig* test be refined or reconsidered and, if so, in what way?

    2. If the *Heinig* test is refined or reconsidered, what criteria might apply to define areas of state or local concern in the context of employe relations and employe benefits?

The cases have been extensively briefed by the parties and numerous amici curiae. For the reasons that follow, we conclude that in enacting these retirement and insurance requirements the legislature did not exceed constitutional bounds and accordingly reverse the decisions below.

# I

The issues in these cases arise from two provisions of the Oregon Constitution that together provide "home rule" for cities and towns.[2] Enacted together by initiative amendment in 1906, they appear in two places in the constitution. The pertinent part of article XI, section 2, provides:

> The Legislative Assembly shall not enact, amend or repeal any charter or act of incorporation for any municipality, city or town. The legal voters of every city and town are hereby granted power to enact and amend their municipal charter, subject to the Constitution and criminal laws of the State of Oregon, . . .

---

    [2] "Home rule" itself is not a constitutional term, and the actual constitutional terms differ from state to state. But "home rule" has been described as the "political symbol" for the objectives of local authority. One study warned that "there is perhaps no term in the literature of political science or law which is more susceptible to misconception and variety of meaning than 'home rule.' " Sandalow, *The Limits of Municipal Power Under Home Rule: A Role for the Courts,* 48 Minn L Rev 643, 644, & nn. 3, 4 (1964), citing sources.

In article IV, section 1a (now 1(5)), the statewide initiative and referendum powers "reserved" to the people by amendment of article IV, section 1, in 1902 were "further reserved to the qualified voters of each municipality and district as to all local, special and municipal legislation of every character in or for their municipality or district.[3]

The relationship between the authority of the legislature and that of local governments under these provisions during the past 70 years has occupied this court in more than 75 cases. As might be expected, the court has employed a variety of formulations in explaining these decisions. This is only proper, since that relationship presents a number of distinct issues rather than a single issue. In any given case, it is necessary to distinguish whether it involves (1) the validity of a local act in the absence of a contrary state law;[4] (2) the validity of a state law in the absence of a contrary local act;[5] (3) the validity of a local act said to conflict with a state law;[6] or (4) the validity of a state

---

[3] Article IV, section 1(5), continues:

The manner of exercising those powers shall be provided by general laws, but cities may provide the manner of exercising those powers as to their municipal legislation. In a city, not more than 15 percent of the qualified voters may be required to propose legislation by the initiative, and not more than 10 percent of the qualified voters may be required to order a referendum on legislation.

Another amendment in 1958 extended to counties the authority to form their own charters and the voters' powers of initiative and referendum. Or Const art VI, § 10.

[4] *E.g., La Grande v. Municipal Court,* 120 Or 109, 251 P 308 (1926); *West Linn v. Tufts,* 75 Or 304, 146 P 986 (1915); *see Lines v. City of Milwaukie,* 15 Or App 280, 515 P2d 938 (1973).

[5] *E.g., Schmidt v. City of Cornelius,* 211 Or 505, 316 P2d 511 (1957); *McKenna v. City of Portland,* 52 Or 191, 96 P 552 (1908).

[6] *E.g., Fischer v. Miller,* 228 Or 54, 363 P2d 1109 (1961); *Terry v. City of Portland,* 204 Or 478, 269 P2d 544 (1954); *Southern Pac. Co. v. Consolidated Freightways, Inc.,* 203 Or 657, 281 P2d 693 (1955); *City of Portland v. Duntley,* 185 Or 365, 203 P2d 640 (1949); *City of Coos Bay v. Aerie No. 538,* 179 Or 83, 170 P2d 389 (1946); *Winters v. Bisaillon,* 152 Or 578, 54 P2d 1169 (1936); *Lyons v. City of Portland,* 115 Or 533, 235 P 691 (1925); *Lovejoy v. City of Portland,* 95 Or 459, 188 P 207 (1920). Often cases of this kind also raise the next issue, when the party defending the validity of the local act attacks the validity of the conflicting state law.

law said to conflict with a local act.[7] To reduce the effect of the amendments on local authority and their effect on the state's authority to a single formula would only obscure the fact that these are two different questions.

■ It is useful to recall the role of the amendments in the state's constitutional arrangements. With respect to local authority, their central object is to allow the people of the locality to decide upon the organization of their government and the scope of its powers under its charter without having to obtain statutory authorization from the legislature, as was the case before the amendments. Thus the validity of local action depends, first, on whether it is authorized by the local charter or by a statute, or if taken by initiative, whether it qualifies as "local, special [or] municipal legislation" under article IV, section 1(5); second, on whether it contravenes state or federal law. With respect to a state law, or action taken under it, on the other hand, it is elementary that the legislature has plenary authority except for such limits as may be found in the constitution or in federal law. Thus the validity of a state law vis-a-vis local entities does not depend upon a source of authority for the law, nor on whether a locality may have authority to act on the same subject; it depends on the limitations imposed by article XI, section 2, *supra.*[8]

Moreover, these constitutional provisions are concerned with the structural and organizational arrangements for the exercise of local self-government, with the power of local voters to enact

---

[7] *E.g., City of Woodburn v. State Tax Comm'n,* 243 Or 633, 413 P2d 606 (1966); *Boyle v. City of Bend,* 234 Or 91, 380 P2d 625 (1963); *State ex rel Heinig v. City of Milwaukie,* 231 Or 473, 373 P2d 680 (1962); *City of Cascade Locks v. Carlson,* 161 Or 557, 90 P2d 787 (1939); *City of Klamath Falls v. Oregon Liquor Control Commission,* 146 Or 83, 29 P2d 564 (1934); *City of Woodburn v. Public Service Comm'n,* 82 Or 114, 161 P 391 (1916); *Branch v. Albee,* 71 Or 188, 142 P 598 (1914).

[8] Another limitation, which antedates the "home rule" amendments, is the prohibition against various "special or local" laws detailed in article IV, section 23.

and amend their own municipal charters and to employ the initiative and referendum for "local, special [or] municipal legislation." They address the manner in which governmental power is granted and exercised, not the concrete uses to which it is put. Except for the limits on the initiative and referendum implied in the quoted phrase of article IV, section 1(5), the amendments do not purport to divide areas of substantive policy between the levels of government. Accordingly, the accommodation of state and local authority most directly involves the amendments when a party invokes a state law as governing some process of local government, such as election,[9] the qualification and selection of local government personnel,[10] taxation and finance [11] or judicial procedures.[12]

The important issue in the early disputes over the effects of the amendments was whether the prohibition of article XI, section 2, extended beyond laws changing a single municipal charter to laws amending such charters generally. The court had been sharply divided in two cases decided in 1914,[13] with Chief Justice McBride, who had been a main sponsor of the 1906 amendments, in dissent. This led the court soon

---

[9] *E.g., City of Woodburn v. State Tax Comm'n,* 243 Or 633, 413 P2d 606 (1966); *Seufert v. Stadelman,* 178 Or 646, 167 P2d 936 (1946); *Thompson v. Nelson,* 155 Or 43, 62 P2d 267 (1936); *Campbell v. City of Eugene,* 116 Or 264, 240 P 418 (1925); *McKenna v. City of Portland,* 52 Or 191, 96 P 552 (1908).

For an example of the opposite issue, a challenge to local procedure on the ground that the subject was one of statewide concern, see *Allison v. Washington County,* 24 Or App 571, 548 P2d 188 (1976).

[10] *E.g., State ex rel Heinig v. City of Milwaukie,* 231 Or 473, 373 P2d 680 (1962).

[11] *E.g., Brown v. City of Salem,* 251 Or 150, 444 P2d 936 (1968); *Bennet v. City of Oceanlake,* 247 Or 539, 430 P2d 1004 (1967); *City of Woodburn v. State Tax Comm'n,* 243 Or 633, 413 P2d 606 (1966); *Boyle v. City of Bend,* 234 Or 91, 380 P2d 625 (1963); *City of Cascade Locks v. Carlson,* 161 Or 557, 90 P2d 787 (1939); *City of Portland v. Welch,* 154 Or 286, 59 P2d 228 (1936); *Burton v. Gibbons,* 148 Or 370, 36 P2d 786 (1934).

[12] *E.g., Boyle v. City of Bend,* 234 Or 91, 380 P2d 625 (1963); *Schmidt v. City of Cornelius,* 211 Or 505, 316 P2d 511 (1957); *La Grande v. Municipal Court,* 120 Or 109, 251 P 308 (1926).

[13] *Branch v. Albee,* 71 Or 188, 142 P 598 (1914); *Kalich v. Knapp,* 73 Or 558, 142 P 594, *rehearing denied,* 145 P 22 (1914).

after to undertake a thorough review of the text and history of these still recent amendments, in a unanimous opinion by Justice Harris. *Rose v. Port of Portland,* 82 Or 541, 162 P 498 (1917). The origin of the amendments, the court found, had been the desire of local communities to enact their own charters and ordinances without having to secure action from the state legislature. The proposal, circulated by a committee that included W. S. U'Ren and Chief Justice McBride and that later organized itself as the People's Power League of Oregon, was accompanied by a statement describing the existing situation to be remedied:

> "The usual method of making city charters in the past has been, in this state, for a few men to agree on the charter they wanted for the city. Then it was introduced in the legislative assembly by one of their county members. It was referred to a committee consisting of the members from his county, reported favorably, of course, and enacted by unanimous consent of the legislature. No other member ever sees or cares anything about it . . . ." 82 Or at 560-561.[14]

The court's opinion continued:

> An examination of the public prints issued at that time discloses that the idea which was uppermost in the minds of all was to take from the legislature the power to make *a* charter for *a* city or town by a *special* law. The evil sought to be removed was the making of a single charter for a single city by a few men who agreed "on the charter they wanted for the city." The suggestion was

---

[14]The explanatory statement continued:

The only exception in Oregon to this method is the charter under which Portland is governed, and which seems to be the most satisfactory the city ever had. This was drafted by a committee of citizens and approved by the people at an election, after which it was enacted by the legislature. But the action of the legislature is a needless formality. Of what interest are the local laws of Portland to farmers of Klamath County, or the charter or ordinances of Lakeview to the fishermen of the Columbia River? This amendment is another step towards home rule in home affairs. If it is enacted it will not only relieve the legislature of a great deal of useless labor, but it will place the power to make the city laws in the hands of the people who have to obey them. 82 Or at 561.

nowhere made that evils were necessarily involved in the enactment of general laws which affected all the cities and towns alike. Indeed, comparatively few general municipal laws had been passed; and it is a noteworthy fact that most of the general municipal legislation was admittedly meritorious, for example, the Bancroft bonding act. While the farmers of Klamath County might not be interested in a law which applied only to Portland and the Columbia River fishermen might not be concerned in the charter or ordinances of Lakeview, yet, both the Klamath County farmers and the Columbia River fishermen might be vitally interested in a general law which expressed a state-wide policy concerning municipalities, and that interest might be just as vital as their interest in a law affecting all road districts, or all school districts or all counties. *Id.* at 561-562.

And Judge Harris ended by expressing satisfaction that his conclusions were fully supported by Chief Justice McBride, "who says that the sponsors for the amendments neither intended nor thought nor even dreamed that the amendments would prohibit the legislature from enacting general laws relating to municipalities, cities and towns." *Id.* at 572.

Thus the court in 1917, on review of the text and the contemporaneous history, reached the conclusion that the legislature retained the power to enact general laws even if they affected the charters of all or many municipalities. *Id.* at 573. Our purpose in quoting this background at length is not to revive that conclusion of *Rose v. Port of Portland.* We do not. Our purpose is only to show that this question whether article XI, section 2, prevented general as well as special laws for municipalities was the issue around which the competing views of that section were stated.

It was also in the context of this argument about the validity of general laws prescribing municipal modes of government that the same issue was reexamined most recently in *State ex rel Heinig v. City of Milwaukie,* 231 Or 473, 479, 373 P2d 680 (1962). There a state law requiring a city to establish a civil service

system, administered by a prescribed city commission, was defended on the ground that it applied to all cities. The court rejected the argument that this fact of itself took the law outside article XI, section 2. Instead, Justice O'Connell wrote,

> we now expressly hold that the legislative assembly does not have the authority to enact a law relating to city government even though it is of general applicability to all cities in the state unless the subject matter of the enactment is of general concern to the state as a whole, that is to say that it is a matter of more than local concern to each of the municipalities purported to be regulated by the enactment. Borrowing the language from *Branch v. Albee,* 71 Or 188, 193, 142 P 598, 599 (1914), we hold that the people of a city are not "subject to the will of the legislature in the management of purely local municipal business in which the state at large is not interested, and which is not of any interest to any outside the local municipality." 231 Or at 479.

But even with respect to a law prescribing municipal modes of government, the court concluded, a general law might be valid if it served a predominant social interest extending beyond the local municipality. This conclusion is consistent with many of the court's decisions in which state standards designed to safeguard the interest of private persons in the procedures of local government have generally been sustained.[15]

■ The quoted holding of *Heinig* states the rule for testing general laws for the processes of city government. The opinion in *Heinig* went further, explaining this holding by a view of the state and its cities as competing sovereignties that seemed to extend to all conflicts of state and local policy. But we do not think

---

[15] *E.g., Brown v. City of Salem,* 251 Or 150, 444 P2d 936 (1968); *Bennet v. City of Oceanlake,* 247 Or 539, 430 P2d 1004 (1967); *City of Woodburn v. State Tax Comm'n,* 243 Or 633, 413 P2d 606 (1966); *Boyle v. City of Bend,* 234 Or 91, 380 P2d 625 (1963); *City of Cascade Locks v. Carlson,* 161 Or 557, 90 P2d 787 (1939). *See also Fasano v. Washington County Comm'n,* 264 Or 574, 507 P2d 23 (1973), and its progeny, in which procedural protections for affected persons have been inferred from state laws authorizing various local government decisions.

that article XI, section 2, extends that far, nor that the *Heinig* formula should be extended beyond the context of laws for city government in which it was formulated. This is so for two reasons. First, constitutional provisions like those for home rule in the first instance are designed to formulate how government is to govern, not how judges are to exercise judicial review. Article XI, section 2, for instance, is addressed to the legislative assembly and to the cities, telling the legislature what it may not do and the voters of the several cities what they may do. Judicial interpretations of such a provision must strive to articulate these directives and avoid formulations that give no guidance to government and leave every policy dispute to judicial decision. Of course this does not mean that challenges to a state or local act under the home-rule provisions are beyond judicial review. We are reviewing such a challenge in this very case. Rather, it bears on the proper interpretation of the provisions.

■ Secondly, however, when such a challenge does reach a court, the court's decision must be derived from a constitutional standard, not from the court's own view of competing public policies. The accommodation of state and local authority over the processes of city government at least involves comparable interests —the citizens' interests in responsible government, in elections, in official accountability, in the procedures of policy planning and decision, taxing and borrowing, and the like. See, for instance, *City of Woodburn v. State Tax Comm'n, supra,* which compared the state and the city's provisions for informing voters of the impact of a tax. These processes of government are the chief object of the municipal charters mentioned in article XI, section 2, as has been set forth more expressly in the more recently formulated constitutional provisions for county charters.[16] They were the

---

[16] Article VI, section 10, provides in part:

The Legislative Assembly shall provide by law a method whereby the legal voters of any county, by majority vote of such voters voting

historical reason for the adoption of the constitutional amendments, as reviewed above. When a comparison of competing policies is pressed beyond this to all conflicts between state and local acts, however, it must often involve a choice among values that have no common denominator either in or outside the constitution. There is no agreed common measure to "weigh" or "balance," for instance, an esthetic environment against commercial profit, *see Oregon City v. Hartke,* 240 Or 35, 400 P2d 255 (1965), or the prevention of caries against strongly felt objections to fluoridation of the water supply, *see Baer v. City of Bend,* 206 Or 221, 292 P2d 134 (1956), if state and local policy should differ on such matters.[17] Such choices are the essence of political, not judicial, decision.

■■ Outside the context of laws prescribing the modes of local government, both municipalities and the state legislature in many cases have enacted laws in pursuit of substantive objectives, each well within its respective authority, that were arguably inconsistent with one another. In such cases, the first inquiry must be whether the local rule in truth is incompatible with the legislative policy, either because both cannot operate concurrently or because the legislature meant its law to be exclusive. It is reasonable to interpret local enactments, if possible, to be intended to function consistently with state laws, and equally reasonable to assume that the legislature does not mean to displace

thereon at any legally called election, may adopt, amend, revise or repeal a county charter. A county charter may provide for the exercise by the county of authority over matters of county concern. Local improvements shall be financed only by taxes, assessments or charges imposed on benefited property, unless otherwise provided by law or charter. A county charter shall prescribe the organization of the county government and shall provide directly, or by its authority, for the number, election or appointment, qualifications, tenure, compensation, powers and duties of such officers as the county deems necessary. Such officers shall among them exercise all the powers and perform all the duties, as distributed by the county charter or by its authority, now or hereafter, by the Constitution or laws of this state, granted to or imposed upon any county officer.

[17] The religious freedom claim in *Baer,* of course, had to be adjudicated under the state and federal clauses guaranteeing that freedom.

local civil or administrative regulation[18] of local conditions by a statewide law unless that intention is apparent. *See, e.g., Terry v. City of Portland,* 204 Or 478, 269 P2d 544 (1954); *City of Portland v. Duntley,* 185 Or 365, 203 P2d 640 (1949); *City of Coos Bay v. Aerie No. 538,* 179 Or 83, 170 P2d 389 (1946); *Lyons v. City of Portland,* 115 Or 533, 235 P 691 (1925). However, when a local enactment is found incompatible with a state law in an area of substantive policy, the state law will displace the local rule. *See, e.g., Winters v. Bisaillon,* 152 Or 578, 54 P2d 1169 (1936), holding that the State Motor Vehicle Act displaced local speed limits and overruling a prior holding that city authority is paramount;[19] *Southern Pac. Co. v. Consolidated Freightways, Inc.,* 203 Or 657, 281 P2d 693 (1955) (same as to trains); *Lovejoy v. City of Portland,* 95 Or 459, 188 P 207 (1920) (licensing insurance agents); *City of Woodburn v. Public Service Comm'n,* 82 Or 114, 161 P 391 (1916) (utility rates), *City of Klamath Falls v. Oregon Liquor Control Comm'n,* 146 Or 83, 29 P2d 564 (1934) (liquor regulation); *Fischer v. Miller,* 228 Or 54, 363 P2d 1109 (1961) (hunting regulations). No state law in an area of substantive policy has ever been held subordinate to a contrary local rule since *Kalich v. Knapp, supra* note 19, was overruled.

It is therefore pertinent to the prohibition expressed in article XI, section 2, to determine whether the challenged law is addressed primarily to a concern of the state with the modes of local government or to substantive social, economic, or other regulatory objectives.

## II

■ Petitioners contend, in advance of reaching this question, that there is no issue of conflicting state and

[18]The reservation in article XI, section 2, *supra,* regarding state criminal law reverses this assumption with respect to such laws.

[19] *Kalich v. Knapp,* 73 Or 558, 142 P 594, *rehearing denied,* 145 P 22 (1914).

local laws in these cases because the pertinent policies of the Cities of La Grande and Astoria are not found in the charter or the ordinances of either city. It is true that article XI, section 2, literally only forbids the legislative assembly to "enact, amend or repeal" such charters, granting that power to the local voters. But cities sometimes place into charters specific actions on substantive matters that are unrelated to the city's governmental processes and, on the other hand, place rules for the conduct of government into ordinances, or perhaps resolutions, by-laws, or other forms of enactment allowed by the city's charter. It is not the label that matters but the role of the provision in local self-government.

The 1906 amendments were not designed to exalt form over substance, on the one hand leaving all local modes of government at the mercy of the legislature unless written into the local charter and on the other hand immunizing from state law any local policy on any subject if only it is placed in the charter. They were designed, as we have said, to secure local control over the structure and organization of local government, and the capacity to act on a community's own initiative in any form, so long as the action is authorized by the voters either in a charter or in "local, special [or] municipal legislation" adopted under article IV, section 1(5), and is not otherwise contrary to law.[20]

In the present cases, the City of LaGrande had undertaken a pension and retirement program for its employees through a private contractor, and Astoria had provided retirement benefits for its employees through collective bargaining. Since it is not claimed that either scheme was unauthorized by the respective charters, they will be treated the same as their underlying charters for the purpose of examining

---

[20]We express no view on a possible local initiative measure that contradicts a local charter without amending it. *Cf. Rose v. Port of Portland,* 82 Or 541, 552-556, 162 P 498 (1917).

whether an inconstitutionally state law uncontitutionally alters the cities' mode of government.[21]

■ The provisions of ORS chapters 237 and 243 requiring retirement and insurance benefits for police officers and firemen do not fail the test stated above. The statutes plainly embody a legislative concern with securing the postemployment living standards of persons in these occupations and their families, not with the cities' governmental organization. It is not essential to the legitimacy of this goal whether the legislature singled out police officers and firemen because it deemed these occupations particularly hazardous or the desired benefits difficult and costly to obtain piecemeal, nor whether its assumptions were well founded. In any event, the statutes are addressed to a statewide substantive, social objective rather than any asserted concern with the modes of local government.

The present legislation avoids the prescription of precise municipal organization involved in the two adverse decisions most nearly in point, *Branch v. Albee*, 71 Or 188, 142 P 598 (1914), and *State ex rel Heinig v. City of Milwaukie, supra.* In *Branch* the challenged statute undertook to establish a police disability and pension fund "in cities of the state, having more than 50,000 inhabitants," to create in the act itself a city "board of police pension and relief," and to designate the precise license fees and fines to be used for the fund.[22] Not surprisingly the court, noting

---

[21] An affirmative decision would leave the unresolved issue whether the state laws remain valid for cities that have taken no action on police officers' and firemen's retirement and insurance benefits. *Cf. Boyle v. City of Bend,* 234 Or 91, 98 & n. 6, 380 P2d 625 (1963). The present decision sustaining these statutes moots that issue.

[22] The act provided that (1) the mayor, chief of police and treasurer were "hereby created and constituted a Board of Police Pension and Relief," charged with administering the law, (2) the mayor was to be chairman, the chief of police secretary, and the treasurer to be treasurer of the board, (3) the board was to direct into the fund percentages of the city's collections from seven named sources, including specified license fees and fines. The remaining sections of the act set out in detail the procedures of the board and the benefits to which police officers and their dependents were to be entitled. Or Laws 1913, ch 287.

that Portland was the only city with more than 50,000 inhabitants, found this to be "an attempt to amend, *by indirection* the charter of the City of Portland" in the manner customary before the 1906 amendments. 71 Or at 201.[23] Similarly, while the statute involved in *Heinig* did not single out one city, it also undertook by the act itself to create municipal civil service commissions, to be composed of three members selected in the manner prescribed by the act, which would be charged with supervising civil service systems for firemen. Even apart from this direct prescription of an element in the city's administrative structure, the civil service law would have displaced the authority of the politically accountable local officials over the selection, assignment, discipline, and replacement of the employees for whose performance they were responsible, and done so not as a matter of the community's policy or negotiated agreement but by direction from the state. This is a substantially different interference with local self-government from an obligation to provide a measure of economic security to public employees. Thus the act was held to be an intervention into the powers of appointment, transfer, and discharge of personnel specified in the Milwaukie city charter, unjustified by any independent statewide concern, and therefore in violation of article XI, section 2.

In contrast, the present statutes do not create any agencies of local government, nor do they direct local communities to do so. They oblige local governments to bring their police officers and firemen under the benefits provided respectively by the state's retirement system and a statewide insurance policy, but even that obligation is made contingent upon an option to provide equal or better benefits by other

[23]The court also held that the provision of pensions for city employees is proper municipal legislation within the meaning of article IV, section 1(5). 71 Or at 205. This is indisputable; however, insofar as the statement reflected an "either/or" theory of state and local legislation, the precedent cited by the court, *Kalich v. Knapp,* was later overruled. *See* text at note 19 *supra.*

means of the local government's choice. ORS 237.620; ORS 243.055. The administrative machinery of these statutes is state administration, not compelled local administration.

## III

Though the legislature in these laws has not mandated city administration in the manner that proved fatal in *Branch* and *Heinig,* its pursuit of its statewide social objective undeniably displaces the arrangements (or absence of arrangements) preferred by the local government. This is not uncommon, as many of our cited decisions show. Nor is it generally useful to define a "subject" of legislation and assign it to one or the other level of government. To treat "local personnel" as such a subject, for instance, would appear to sweep beyond the civil service law invalidated in *Heinig* and to raise doubt whether local employees also must be excluded from all state occupational qualifications or state protective laws, *e.g.,* workers' compensation, wage and hour standards, safety standards, nondiscrimination, or child labor laws. *Cf. Pederson v. City of Portland,* 144 Or 437, 24 P2d 1031 (1938), sustaining the application of a state law requiring overtime pay to city employees.[24] But if these doubts can be made to disappear by defining the "subject" of the same laws to be safety, or nondiscrimination, or job security, the definition merely marks the desired conclusion of an argument rather than its premise.[25] A search for a predominant state or local interest in the "subject matter" of legislation can only

[24] *See e.g., Von Walter v. City of Canby,* 19 Or App 60, 526 P2d 599 (1974).

[25] Allocation by "subject" had its federal analogue a century ago in the United States Supreme Court's formula for deciding the validity of state laws by determining whether their "subjects" (if potentially within the power of Congress over commerce) were "in their nature national." *Cooley v. Board of Wardens,* 53 US (12 How) 299, 13 L Ed 996 (1851). It is not obvious why the "subject" of the law in question, the requirement to use local pilots in ports, was "navigation" rather than "the protection of docks and wharves," or vice versa. The formula was later superseded by others. *Compare, e.g., Huron Portland Cement Co. v. City of Detroit,* 362 US 440, 80 S Ct 813, 4 L Ed 2d 852 (1960).

substitute for the political process to which we have referred the court's own political judgment whether the state or the local policy should prevail.[26] Moreover, as the foregoing examples show, it misconceives the nature of a "state interest" to focus narrowly on the functions performed by particular groups of employees to the exclusion of a concern with the employees as citizens. The "state" as such has no interest apart from that of its inhabitants, present and future; and the legislature may, if it so chooses, consider the interests of those who perform the job as well as the interests of those dependent on that performance.[27]

The geographic boundaries of local entities are not much more determinative in excluding state concerns. Arguments presented in these cases, as in *Heinig,* point out that city police officers and firemen are sometimes assigned duties beyond their cities, but this is hardly needed to demonstrate a state concern. Large complexes of state buildings and state personnel such as college campuses, and indeed the state Capitol, executive offices, and this court, depend on the quality of police and fire protection within city limits, and thousands of persons who frequent city streets and business districts every day are not city residents. The state relies on local governments for many functions deemed important to the state within local boundaries, most recently land use controls.[28] *See South of Sunny-*

[26]The dissenting position, in seeking to apply the *Heinig* approach to social or other substantive legislation, contains little to explain why that approach would invalidate the present pension and insurance requirements, as compared for instance with workers' compensation or minimum wage laws, nor why the formula would not equally justify the opposite result.

[27]The habit of justifying humanitarian legislation by supposedly pragmatic assertions about the consequences of labor unrest and the like probably stems from the history of bringing *federal* labor law within the reach of Congress under the commerce clause, a problem the state does not face. *See Railroad Retirement Board v. Alton R. R.,* 295 US 330, 55 S Ct 758, 79 L Ed 1468 (1935); *NLRB v. Jones & Laughlin Steel Corp.,* 301 US 1, 57 S Ct 615, 81 L Ed 893 (1937).

[28]Indeed, sometimes even beyond their boundaries; *cf.* ORS 92.042 (city jurisdiction over subdivisions within six miles of city). *See also Bell v. City of Corvallis,* 25 Or App 821, 551 P2d 125 (1976) (water and sewer service).

[ 154 ]

*side Neighborhood League v. Board of Comm'rs,* 280 Or 3, 569 P2d 1063 (1977). The modern addition of home rule for counties would create additional complexities in employing a geographic criterion for allocating mutually exclusive constitutional authority.

Finally, as individuals we may differ with legislative policies that mandate substantive standards for programs and activities for which local taxpayers and local officials rather than state legislators will bear the fiscal responsibility. But if there are other constitutional limitations than the "home rule" amendments that preclude the particular financial effect of the statutes involved in these cases, the parties have not brought them to the court's attention. The simple provision of article XI, section 2, that "[t]he Legislative Assembly shall not enact, amend or repeal any charter or act of incorporation for any municipality, city or town" does not purport to sweep that broadly.[29]

Thus neither the form in which the local policy is cast, nor the "subject" of the state law, nor the existence of local boundaries can by itself determine

---

[29] Contemporary fiscal interrelationships between the federal, state, and local governments are far more complex than the simple notion of local programs financed from local property taxes suggests.

In one recent fiscal year, for instance, Oregon cities received a total of $223 million from their own taxes, fees, utility revenues, and other sources but also $91 million in revenues from various federal, state, county, and district sources. Bureau of Governmental Research and Service, School of Community Service and Public Affairs, University of Oregon, Revenue Sources of Oregon Cities, Fiscal Year 1973-74, at 6-7 (Apr. 1975); *see, e.g.,* Or Laws 1977, ch 831, which transferred an additional 14 percent of state liquor revenues to the cities for general purposes, beyond a prior 20 percent share. ORS 471.810. From the other perspective, a conservative listing of transfer payments from the state to cities and counties in the 1977-79 biennium would total at least $245 million. This includes sharing of revenue from gasoline taxes, highway use taxes, cigarette taxes, the Oregon Liquor Control Commission, the Oregon Racing Commission, and other specified sources and, in addition, general fund expenditures for programs such as community corrections, mental health, land use planning, public safety, and public transit. It does not include many other state payments to local agencies for local purposes, such as payments to school, port, transit, and other special districts and local councils of government. *See* Budget and Management Division, Oregon Executive Dep't, Adopted Budget, Fifty-Ninth Legislative Assembly, 1977-79, at 67-76 (Dec. 1, 1977).

the validity of a statewide law. Instead, we conclude that the following principles for resolving a conflict between such a law and an inconsistent local provision for the conduct of city government are consistent with our past interpretations of the "home rule" amendments:[30]

■ When a statute is addressed to a concern of the state with the structure and procedures of local agencies, the statute impinges on the powers reserved by the amendments to the citizens of local communities. Such a state concern must be justified by a need to safeguard the interests of persons or entities affected by the procedures of local government.

■ Conversely, a general law addressed primarily to substantive social, economic, or other regulatory objectives of the state prevails over contrary policies preferred by some local governments if it is clearly intended to do so, unless the law is shown to be irreconcilable with the local community's freedom to choose its own political form.[31] In that case, such a state law must yield in those particulars necessary to preserve that freedom of local organization.

As we have said, the statutes challenged by the cities in these cases are of the second, substantive kind. The provisions for financial security for police officers and firemen and their dependents in the event of retirement, disability, or death address a social concern with the living standards of these classes of workers, not with local governments as such. Various categories of employees are not placed beyond the reach of the state's social legislation merely because

---

[30]To forestall possible misunderstanding: These principles refer to the *limitation* on state legislation stated in article XI, section 2, not to the *powers* granted local communities and voters under that section and article IV, section 1(5).

[31]Instances where general regulatory laws have this effect are probably rare, but hypothetical examples might be state laws that would impose policy responsibilities or record-keeping, reporting, or negotiating requirements on persons or entities contrary to their allocation under the local charter.

their occupational functions—here police and fire protection, elsewhere perhaps municipal transit or utility or library services—happen to be found in the public sector of local government. While the statewide retirement and insurance plans do displace other plans that local agencies have made, or might make, for these objectives, they are not irreconcilable with the freedom to charter their own governmental structures that are reserved to the citizens of Astoria and La Grande by article XI, section 2. Accordingly, the statutes are constitutional.

Reversed.

**TONGUE, J.,** dissenting.

I agree that, as a general rule, dissenting opinions should be restrained and respectful. It is difficult to do so, however, when, because of a purely fortuitous change in the membership of this court, there is now a majority which, by a margin of one vote, has prevailed by an opinion which:

(1) Drastically upsets the long-existing balance of power between Oregon cities and the state legislature in the critical area of "home rule" by abandonment of the long-established concept that the "home rule" amendments to the Oregon Constitution granted to Oregon cities exclusive power to legislate as to all matters of "local interest," i.e., a grant of "local autonomy," free from intervention by the state legislature, and with the courts as the arbiters of disputes between cities and the state as to what are matters of "local interest." (*See* 162 to 168.)

(2) Substitutes for that long-established concept of "local autonomy" a new rule of "legislative supremacy," to the effect that the state legislature may legislate as to all matters which *it* deems to involve some state-wide interest, with the single exception of some matters involving the "structure and procedures of local agencies." (*See* 168 to 184.) Despite the fact that the Oregon courts have long served as a protective

"fence" between "the fox and the chickens," the majority has now removed most of the "fence," leaving the "chickens" at the mercy of the "fox."

(3) Overrules a line of unanimous decisions extending for a period of more than 40 years in which this court has carefully considered this entire matter. Also ignored by the majority are the views expressed by many writers in accord with those decisions by this court. As a substitute, the majority has adopted a new and novel rule for which it cites no direct authority and which is a "hybrid of uncertain ancestry." (*See* 168 to 171.)

(4) Permits the legislature to transfer to the cities the cost of expensive social programs of predominately local interest, without the state assuming financial responsibility for such programs, thus compelling Oregon cities to make expenditures, incur debts, or levy taxes to raise funds for such programs. (*See* 191 to 193.)

(5) Uses this case as a vehicle for a "judicial *tour de force*" by the adoption of that new and unprecedented rule despite the fact that the majority could have sustained the validity of state laws requiring cities to provide pensions for police officers and firemen by application of the rule previously recognized by this court for application in such cases. (*See* 189 to 191.)

(6) Decides this case upon the basis of a new and drastic rule not urged by any of the parties or amicus curiae in this case, upon which these cities have had no fair opportunity to be heard and which, as a practical matter, is imposed upon them "without due process." (*See* 168, 171-174, 178, 182, 184, 193.)

In order to evaluate the validity of these contentions it becomes necessary, after reviewing some of the background of "home rule" in Oregon, to discuss the differences between the rule as adopted by the majority and the previous decisions of this court on the following subjects: (1) the purpose of the Oregon

"home rule" amendments; (2) the proper test to be applied in determining what matters are reserved to the cities for "home rule"; (3) the role of the courts in the application of that test; (4) the role of the legislature in the application of that test; (5) the proper application of that test in this case, and (6) the financial impact upon Oregon cities of the rule of "legislative supremacy" as adopted by the majority.

## I. *The previously established law of "home rule" in Oregon.*

### A. *General authorities—the Oregon "home rule" amendments.*

It has been recognized by authorities on this important subject that one of the basic purposes of "home rule" is to "stake out a limited area where local government could legislate for itself"[1] and to "carve out an area in which the municipality enjoys a measure of *local autonomy* free from legislative interference or control * * *."[2] It has also been recognized, however, that "[h]ome rule does not mean, and has never been intended to mean, complete local autonomy within the states, because home rule cities must always remain integral parts of state government and must assume, like non-home rule cities, responsibility for enforcement of state law," but that, "[o]rdinarily, a home rule grant transfers authority from the state legislature to the municipalities to enact measures of purely municipal concern."[3] Thus, it has been more accurately stated that "home rule" is a method for

---

[1]Dyson, *Ridding Home Rule of the Local Affairs Problem,* 12 Kan L Rev 367, 368 (1964).

[2]Sharp, *Home Rule in Alaska: A Clash Between the Constitution and the Court,* 3 UCLA-Alaska L Rev 1, 3 (1973), and also stating (at 3) that this is a "protective function" and that the other basic purpose is a "grant or validating function."
*See also* Vanlandingham, *Municipal Home Rule in the United States,* 10 Wm and Mary L Rev 269 (1968).

[3]Vanlandingham, *supra* n. 2, at 280.

"distribution of power by the people between two levels of government—state and local."[4]

According to a recognized authority on this subject:

"Almost without exception, modern students of municipal affairs have urged the desirability of a broad grant of municipal initiative through the mechanism of home rule. * * *"[5]

The problem, as recognized by another writer, is

"* * * to devise a home rule scheme whereby the city and state have a maximum degree of freedom to act on community problems, separately or together, while at the same time providing for the resolution of jurisdictional conflicts."[5a]

Generally speaking, there are two types of state constitutional provisions for home rule: (1) those which grant to the cities "local autonomy" within a limited area, the boundaries of which are left to judicial determination, and (2) those which recognize "legislative supremacy" as to all areas, but permit municipal legislation in areas not pre-empted by state legislation.[6]

It has been said that the "local autonomy" approach offers a more substantial guarantee of meaningful

---

[4] Vaubel, *Municipal Home Rule in Ohio,* 3 Ohio N U L Rev 3, 11 (1975).

[5] Sandalow, *The Limits of Municipal Power Under Home Rule: A Role for the Courts,* 48 Minn L Rev 643, 652 (1964). It is of interest to note that the majority also (n.2 at 3) quotes with approval from this article by Sandalow.
Sandalow goes on to state as follows (at 652, 656):

"* * * The virtual unanimity with which they have arrived at this conclusion reflects, in part, rejection of the distrust of municipal government which has traditionally marked American politics * * * in part, it also reflects a consensus that alternative methods of providing municipal powers are unsatisfactory.

"* * * * *

"Ultimately, the argument for a broad grant of municipal initiative rests upon the desirability of permitting municipalities to govern generally, rather than limiting them to the exercise of particular functions. * * *."

[5a] Dyson, *supra* n. 1, at 380.

[6] *See* Vanlandingham, *Constitutional Municipal Home Rule Since the AMA (NLC) Model,* 17 Wm and Mary L Rev 1, 2 (1975).

home rule power, although creating a difficult task for the courts in determining what areas are subject to "local autonomy"; whereas the "legislative supremacy" approach, while obviating much of that difficulty, makes most substantial home rule powers depend upon "legislative grace" and encourages state legislatures to impose financial burdens on cities.[7]

As of 1906, when the "home rule" amendments to the Oregon Constitution were adopted, five other states had previously adopted "home rule" amendments, including Missouri, California, Washington, Minnesota and Colorado, with varying results.[8]

---

[7] Vanlandingham, *supra* n. 6, at 26, and at 18 and 20. *See also* discussion below (at 47-50.)

[8] In Missouri the constitutional grant to cities of over 100,000 population, as adopted in 1875, was to "frame a charter for [their] own government, consistent with and subject to the Constitution and laws of this State." Constitution of Missouri, Art IX, § 16 (1875). That provision was interpreted by the Missouri courts to mean that "[m]atters of purely municipal and local concern the constitution intended to commit to local self-government." *City of St. Louis v. Dorr,* 145 Mo 466, 46 SW 976, 978 (1898). *See also* Westbrook, *Municipal Home Rule: An Evaluation of the Missouri Experience,* 33 Mo L Rev 45, 52 (1968).

In California an almost identical constitutional amendment was adopted in 1879. Constitution of California, Art XI, § 6 (1879), but the words "subject to and controlled by general laws" were literally construed by the California courts, with the result that in 1896 that provision was amended to add the express qualification "except in municipal affairs." Constitution of California, Art XI, § 6 (1896).

In Washington a constitutional provision similar to that of the original California provision was adopted in 1889 and was also construed literally, so as to provoke the comment that home rule in Washington was "largely a matter of legislative grace." Constitution of Washington, Art XI, § 10 (1889); McBain, The Law and Practice of Municipal Home Rule 455-56 (1916).

In Minnesota the constitutional provision adopted in 1896 was more specific in providing that "[t]he legislature may provide by general laws relating to affairs of cities * * *." Constitution of Minnesota, Art IV, § 36 (1898).

In Colorado a constitutional amendment was adopted in 1902 conferring upon the people of the City and County of Denver "the exclusive power in the making, altering, revising or amending that charter * * *." Constitution of Colorado, Art XX, § 4 (1902), but was not construed in any definitive opinions by the Colorado courts prior to 1906, when "home rule" was adopted in Oregon. McBain, The Law and Practice of Municipal Home Rule 505-26 (1916). *But see People ex rel The Attorney General v. Johnson,* 34 Colo 143, 86 P 233 (1905).

In view of the problems arising under the "home rule" amendments to the Missouri, California and Washington constitutions (which granted to cities the power to adopt charters *consistent with and subject to the constitution and laws of this State*), and also in view of the subsequent amendment to the California Constitution with a specific grant relating to *"municipal affairs,"* it is significant that in Oregon the "home rule" amendments provided (in Art XI, § 2) not only that the voters of every city were granted the power to enact and amend their city charters "subject to the Constitution and *criminal* laws of the State of Oregon" but also provided (in Art IV, § 1a, now § 1(5)) that the initiative and referendum powers as previously "reserved" to the people were extended to the voters of every city "as to *all local, special and municipal legislation of every character."*

B. *The previous interpretation of the Oregon "home rule" amendments by this court.*

1. *The purpose of such amendments.*

As noted by the majority, these amendments to the Oregon Constitution have been variously interpreted by the court. Indeed, during the first 30 years there were two distinct lines of cases. One, including *Branch v. Albee,* 71 Or 188, 142 P 598 (1914) (involving the validity of a state law requiring the City of Portland to adopt a pension system for policemen—almost the exact question presented in this case), held that these provisions were intended to grant to cities "full power to legislate for themselves as to all local, municipal matters."[9] The other, including *Rose v. Port of Portland,* 82 Or 541, 162 P 498 (1917), held that these provisions were not intended to grant such broad powers, but only "to take from the legislature the power to make *a* charter for *a* city or town by a *special* law."[10]

---

[9] *See Kalich v. Knapp,* 73 Or 558, 142 P 594, 145 P 22 (1914).

[10] *See also, e.g., Hillsboro v. Public Service Commission,* 97 Or 320, 336, 187 P 617, 192 P 390 (1920).

During the past 40 years, however, there has been no such division. In 1936, in *City of Portland v. Welch,* 154 Or 286, 59 P2d 228, much of the previous conflict in the decisions of this court on this question was resolved. In *Welch* this court, in a unanimous opinion, quoted with approval from 1 McQuillin, Municipal Corporations § 93 (2d ed 1928), a leading authority on municipal law, as follows:

> "The purpose (referring to the home rule amendments) was to give local communities full power in matters of local concern, that is, in those matters which peculiarly affected the inhabitants of the locality, not in common with the inhabitants of the whole state. * * *" 154 Or at 297.

This court in *Welch* (at 296) also quoted with approval from an opinion in *Pearce v. Roseburg,* 77 Or 195, 208, 150 P 855 (1915), by Chief Justice McBride, one of the "framers" of the "home rule" amendments, in which he stated that he considered it to be

> "* * * settled in this state that as to matters purely municipal the state legislature can not intermeddle by either general or special legislation, although as to matters affecting the people generally the power of the legislature is still unlimited. * * *"

This is of particular significance in view of the fact that in *Rose v. Port of Portland,* 82 Or 541, 162 P 498 (1917), Justice Harris stated (at 572) that Justice McBride was then of a contrary view—a statement deemed by the majority opinion in this case (145) to be of some significance.[11]

Since the decision in *Welch* in 1936, the law on the subject of the purpose of the "home rule" amendments has been unchanged and has again been "settled" to the effect that the purpose of the Oregon "home rule" amendments was to make a grant to cities of "full

---

[11] It is of some interest that Justice Harris, who stated a rule of "legislative supremacy" in *Rose v. Port of Portland,* 82 Or 541, 162 P 498 (1917), was a former legislator and Speaker of the Oregon House of Representatives.

power in matters of local concern," free from "legislative interference." Since then this court has not again held, as in *Rose,* that such was not the purpose of the Oregon "home rule" amendments.[12]

In 1962 this court reaffirmed the position taken in 1936 in *Welch* in a unanimous opinion by Chief Justice O'Connell, *State ex rel Heinig v. Milwaukie et al,* 231 Or 473, 373 P2d 680, which reviewed not only the previous decisions by this court on this subject, but also the writings by various authorities on municipal law. After carefully reviewing, considering and citing many of these authorities, this court expressly and unanimously held as follows:

> "That purpose, stated broadly, was to make operative the concept that the closer those who make and execute the laws are to the citizens they represent the better are those citizens represented and governed in accordance with democratic ideals. That objective would not be served if we should decide that the legislative assembly pre-empts the field each time it makes a statute applicable to all cities alike." 231 Or at 481-82.

That purpose of the Oregon "home rule" amendments, as held in both *Welch* in 1936 and in *Heinig* in 1962, was again reaffirmed in a unanimous opinion by Justice Holman in *City of Woodburn v. Tax Com.,* 243 Or 633, 637, 413 P2d 606 (1966), quoting with approval from both *Heinig* and *Welch.*[13] Also, in *Boyle v. City of Bend,* 234 Or 91, 380 P2d 625 (1963), it was held (at

---

[12]In cases subsequent to *City of Portland v. Welch,* 154 Or 286, 59 P2d 228 (1936), this court quoted from *Burton v. Gibbons,* 148 Or 370, 36 P2d 786 (1934), one of the cases in the *Rose* line. *See State ex rel v. North Bend,* 171 Or 329, 338, 137 P2d 607 (1943); *State ex rel v. Chandler et al,* 180 Or 28, 34, 175 P2d 448 (1946); *So Pacific Co. v. Con Freightways,* 203 Or 657, 664, 281 P2d 693 (1955). In *Schmidt et al v. City of Cornelius,* 211 Or 505, 529, 316 P2d 511 (1957), however, this court noted an apparent conflict between the "dictum" in *Burton* and the "clear statement" in *Welch,* explaining that *Welch* qualified the *Burton* dictum.

[13]This rule has also been relied upon as the established law of Oregon by the Court of Appeals in "home rule" decisions which we have declined to review. *Von Walter v. City of Canby,* 19 Or App 60, 65, 526 P2d 599 (1974); *Beaverton v. I.A. Fire Fighters,* 20 Or App 293, 303, 531 P2d 730 (1975); *City of Hermiston v. ERB,* 27 Or App 755, 761, 557 P2d 681, *rev on other grounds,* 280 Or 291, 570 P2d 663 (1977).

98 n.6), citing *Heinig,* that "a statute is inoperative to the extent that it conflicts with an ordinance on a matter of local concern."

Most recently, in another unanimous opinion by Chief Justice Denecke, in *Olsen v. State of Oregon,* 276 Or 9, 554 P2d 139 (1976), although not directly involving the Oregon "home rule" amendments, this court said (at 25) that:

> "*In Oregon this emphasis on local control is constitutionally accentuated.* Art XI, § 2, and Art VI, § 10, of the Oregon Constitution provide for home rule by cities and counties; that is, the voters of the cities and counties can enact their own charters which shall govern *on matters of city or county concern.*" (Emphasis added)

### 2. *Test to be applied.*

In *Heinig* this court held that "the real test" to be applied in determining whether a particular matter is one of "local" or "state" concern is "not whether the state or the city has an interest in the matter, for usually they both have, but whether the state's interest or that of the city is paramount." 231 Or at 481. In other words:

> "* * * [T]he question is not simply whether the state has an interest in such operations, but whether it is substantial enough to predominate over the interest of the city." 231 Or at 484.

Again, that "test," as stated in *Heinig,* was later expressly approved by this court in a unanimous opinion by Justice Holman in *City of Woodburn v. Tax Com., supra,* at 636, following a previous decision in *Boyle v. City of Bend,* 234 Or 91, 99, 380 P2d 625 (1963), which also cites *Heinig* with approval.[14]

---

[14] Again, this test has also been recognized and applied by the Court of Appeals in cases which we have declined to review. (*See* cases cited n.13, *supra.*)

The application of the test, as stated in *Heinig* (*State ex rel Heinig v. Milwaukie et al,* 231 Or 473, 373 P2d 680 (1962)), was well described by Chief Judge Schwab in *City of Hermiston v. ERB,* 27 Or App 755, 761, 557 P2d 681, rev on other grounds, 280 Or 291, 570 P2d 663 (1977), as one which requires the Oregon courts to

> "* * * (1) identify the city's interest; (2) identify the state's interests; and (3) balance them to determine which predominates."

[ 165 ]

This court also held in *Heinig* (at 488) that:

"* * * Each case requires a weighing of the state's interest against the interest of the municipality. * * *"

### 3. *Jurisdiction of the courts.*

In *Heinig* it was also held unanimously that it is for the courts of Oregon to determine what matters are of predominately state-wide interest, so as to be subject to the exclusive power of the legislature, and what matters are of predominately local interest, so as to be subject to the exclusive power of Oregon cities in holding (at 483-84) that:

"* * * [U]nder the theory of home rule which we have adopted there are involved two political agencies making conflicting claims to sovereignty, and the resolution of that conflict must be made by the courts."

There was nothing "new" in this assertion of jurisdiction in *Heinig*. Indeed, this court had exercised such jurisdiction in many previous cases. In previous cases, however, this court had not stated the "test" to be applied in the exercise of such jurisdiction, as subsequently stated in *Heinig*.[15]

### 4. *Power of the legislature.*

This court expressly held in *Heinig* (at 488) that:

"* * * The grant of sovereignty emanates from the same source, the people of the state. There is nothing in the manner of making the division of sovereignty which would suggest a constructional preference for state legislation. * * *"

and (at 479) that:

"[T]he legislative assembly does not have the authority to enact a law relating to city government even though it is of general applicability to all cities in the state unless the subject matter of the enactment is of general concern to the state as a whole * * *.

---

[15] Again, subsequent decisions by this court in *City of Woodburn v. Tax Com.*, 243 Or 633, 413 P2d 606 (1966), and by the Court of Appeals in *Beaverton v. I.A. Fire Fighters*, 20 Or App 293, 531 P2d 730 (1975), and other cases have continued to exercise the jurisdiction of the Oregon courts under the test as stated in *Heinig*. *See* cases cited n.13, *supra.*

"An enactment is not of state-wide interest simply because the legislature decides that each of the cities in the state should be governed by the same law. * * *"

This result necessarily follows from the holding in *Heinig* consistent with previous decisions of this court, that it is for the Oregon courts to resolve questions of "conflicting claims to sovereignty."[16]

As of the date of the filing of the complaint in these two cases in 1976, it would appear to be a fair statement that the law of Oregon on the subject of "home rule" appeared to be settled, at least to the extent of a recognition that (1) one of the basic purposes for Oregon's "home rule" amendments was to "carve out" an area of "local autonomy" for the cities of Oregon by a grant to the cities of full and exclusive power over matters of "local concern," free from interference by the state legislature, although reserving to the legislature full power to legislate by general laws on "matters affecting the people generally"; (2) that the test to be applied in determining whether a particular matter is subject to the exclusive "home rule" power of cities over matters of "local concern" was to determine whether the city has an interest which "predominates" over that of the state; (3) that the application of this test and the resolution of such "jurisdictional disputes" between cities and the state was a matter to be decided by the Oregon courts; and

---

[16] *See, e.g., City of Portland v. Welch,* 154 Or 286, 59 P2d 228 (1936), in which this court held (at 295) that:

"* * * [W]e conclude that the authority of the city to legislate relative to matters germane to purely municipal affairs has been derived not from the legislature but from the constitution itself. If that is a sound conclusion, can it be true that the legislature, under the guise of a general law, can interfere with the exercise of such right? We take it to be fundamental that the legislature could not do so through the enactment of a special law. Hence, what the legislature can not do directly it can not do through indirection."

and (at 296) that:

"* * * A law general in form can not, under the constitution, deprive cities of the right to legislate on purely local affairs germane to the purposes for which the city was incorporated," going on to cite previous decisions of this court to the same effect.

(4) that the legislature had no power to "intermeddle" by general laws in matters of "local concern."

This meant, of course, that the courts must determine in each case the question of whether the interest of the city was so great as to "predominate" over that of the state, so as to be within the exclusive "home rule" powers of the city involved, or whether the interest of the state was so great as to "predominate" over that of the city, so as to be a proper subject of a general statute.

It is most significant to note that none of the parties by their briefs in these two cases denies that the law relating to the Oregon "home rule" amendments with reference to (1) purpose; (2) test to be applied; (3) role of courts; and (4) role of legislature at the time of the filing of these cases was as stated in *Heinig.* Instead, the sole dispute as presented by such briefs is over the question whether, under the rule as stated in *Heinig,* the pension program and life insurance policies required by ORS 237.610 to 237.640 and ORS 243.005 to 243.055 are matters of "local concern," so as to be subject to the exclusive "home rule" power of the cities.

## II. *The majority opinion.*

### A. *Purpose of the Oregon "home rule" amendments.*

The basic premise and foundation upon which most of the reasoning of the opinion by Justice Linde rests is revealed by his statement (at 142) that the "central object" of the Oregon "home rule" amendments was to "allow the people of the locality to decide upon the organization of their government and the scope of its powers under its charter without having to obtain staturory authorization from the legislature, as was the case before the amendments," and his statement (at 144 and 145) that, according to *Rose v. Port of Portland, supra,* "the sponsors for the amendments neither intended nor thought nor even dreamed that

[ 168 ]

the amendments would prohibit the legislature from enacting general laws relating to municipalities, cities and towns."

The majority says (at 143) that "the accommodation of state and local authority *most directly* involves the ["home rule"] amendments when a party invokes a state law as governing some *process* of local government," citing cases; that in *Heinig,* which involved a civil service system, reference was made by this court (231 Or at 479) to the authority of the state to enact a law "relating to *city government*" (at 146); and (at 146) that "[t]he *quoted holding* of *Heinig* states the rule for testing general laws for the *processes* of city government."

Based upon this reasoning the majority then announces a completely new concept—namely, that the intended purpose of the Oregon "home rule" amendments was only to grant to the cities the limited power to legislate upon matters involving what the majority refers to variously as "processes" or "mode" of local government, or as "structure and organization" or "structure and procedures" of local government, as distinguished from "substantive social, economic or other regulatory objectives."

It is obvious, of course, that this new concept by the majority that the intended purpose of the Oregon "home rule" amendments is limited to matters involving "organization," "structure" or "procedure" of local government imposes a drastic limitation upon the area in which cities have exclusive power to legislate, as compared with the view as previously accepted for the past 40 years, as stated in *Welch, Heinig* and *Woodburn,* to the effect that the intended purpose of these constitutional amendments was to make a grant to cities of "full power" in all matters of "local concern," free from "intermeddling" by the state legislature. It is equally obvious that this new concept compels a dramatic shift in the balance of power between the state legislature and Oregon cities in the important area of home rule.

[ 169 ]

But aside from the drastic nature of this change, it is submitted, with all due respect, that this new concept, which is the foundation upon which the majority rests its opinion, is not only a curious hybrid of uncertain ancestry, but is unsound and should have been rejected by this court for the following reasons:

(1) Matters of "substance," as well as matters of "procedure," can be matters of "predominantly local interest." For example: the style of uniforms worn by firemen (an example referred to by this court in *Heinig* (231 Or at 485)) or the number and location of benches or swings in a city park. On the other hand, matters of "procedure" of city government may be of "predominantly state-wide interest," such as the manner in which a ballot measure for a municipal tax measure is stated, for information of the voters. *City of Woodburn v. Tax Com., supra.*

(2) The fact that most previous cases presented to this court, including *Heinig,* may have involved "some process of local government" is, of itself, wholly insufficient to support the conclusion that the Oregon "home rule" amendments were *intended* to make a grant of home rule power to cities which was *limited* to matters of "organization," "structure" or "procedure," in the absence of a proper basis for such a conclusion in the terms of the Oregon "home rule" amendments.

(3) There is nothing in the terms of the Oregon "home rule" amendments which supports, or is claimed by the majority to support, its conclusion that the intended purpose of these constitutional amendments was to limit the grant of home rule powers to cities to matters of "organization," "structure" or "procedure" and to reserve to the state the exclusive power to legislate as to all other matters by general "civil" laws. On the contrary, Art IV, § 1(a) (now § 1(5)), expressly reserves power to the voters of cities over *"all local, special and municipal legislation of every character"* and Art XI, § 2, provided that the home rule process granted to cities was subject only to

"the Constitution and *criminal* laws of the State of Oregon."[17]

(4) The conclusion by the majority that the intended purpose of these constitutional amendments was to limit the grant of home rule powers to cities to matters of "organization," "structure" or "procedure" is not only contrary to the decisions by this court for the past 40 years, including *Welch, Heinig* and *Woodburn,* but is also contrary to, and not supported by, its previous decision in *Rose.* Under the rule of "legislative supremacy" as stated in *Rose,* the state legislature would have power to enact general laws relating to *all* matters involving cities, presumably including matters of "organization," "structure" or "procedure."[18]

(5) While there may be some virtue in a more specific definition of the nature and scope of the matters subject to a constitutional grant of "home rule" to cities, in the absence of specific definitions or other terms as set forth in a constitutional home rule amendment,[19] the courts have usually declined to attempt to specify such matters by "judicial fiat," but have usually held, as in Oregon by *Welch, Heinig* and *Woodburn,* that the purpose of amendments in such broad terms was to make a grant to cities of exclusive power to legislate as to all matters of "local concern," except for those courts which have adopted a rule of "legislative supremacy" as to all matters.[20]

(6) None of the parties or amicus curiae in these cases contended by their briefs in these cases that this court should overrule *Welch, Heinig* and *Woodburn,* on

---

[17] *See Branch v. Albee,* 71 Or 188, 197-98, 142 P 598 (1914).

[18] *See Tichner v. Portland,* 101 Or 294, 301, 200 P 466 (1921), citing *Rose v. Port of Portland, supra* n.11.

[19] *See* Constitution of Rhode Island, Amendment 28, § 4 (1951); Constitution of Colorado, Art 20, § 6 (as amended 1912); American Municipal Association (National League of Cities), Model Constitutional Provisions for Municipal Home Rule (1963).

[20] *See* 2 McQuillin, Municipal Corporations §§ 4.83, 4.84, 4.85 (3d ed rev 1966), and cases cited therein, and 1 Antieau, Municipal Corporation Law §§ 3.17, 3.20 and 3.21 (1977), and cases cited therein.

[ 171 ]

this important matter, but all proceeded upon the implicit assumption that the purpose of the Oregon "home rule" amendments is to grant to cities exclusive power to legislate on all matters of "local concern, as held in *Welch, Heinig* and *Woodburn,* and that the issue to be decided in these cases is whether these statutes involve matters of state or local concern.

Prior to oral argument in these cases this court, by letter, requested that the parties be prepared on oral argument to respond to the following questions:

"1. In *State ex rel Heinig v. Milwaukie et al,* 231 Or 473, 373 P2d 680 (1962), this court announced a test to be used in determining when the state can legislate on a matter of local concern. Should the *Heinig* test be *refined* or *reconsidered* and, if so, in what way?

"2. If the *Heinig* test is *refined* or *reconsidered,* what criteria might apply to define areas of state or local concern in the context of employe relations and employe benefits?" (Emphasis added)

At oral argument counsel for the defendant unions suggested, and for the first time, that the *Heinig* test be "refined" by substitution of a "substantial or significant state interest" analysis for the *Heinig* "predominant state interest" analysis. None of the parties, however, either in their briefs or at oral argument, suggested that *Heinig* be either "refined" or "reconsidered" by substituting for it the theory now adopted by the majority as the basis for its decision.

This court has held many times that a party cannot raise issues or concepts that he did not present and rely upon in the trial court and that this court will not consider a new theory as the basis for the decision of a case raised for the first time on appeal, even when such a new theory, having been raised on appeal by the brief of one party, afforded to the other party a full opportunity to be heard in opposition to it.[21] There

---

[21] *See, e.g., Edwards, Guardian v. Hoevet,* 185 Or 284, 297, 200 P2d 955 (1949); *Nordling v. Johnston,* 205 Or 315, 340, 283 P2d 994, 287 P2d 420 (1955); *Chaney v. Fields Chevrolet Co.,* 258 Or 606, 613, 484 P2d 824 (1971), and cases cited therein.

[ 172 ]

have been some cases which have been decided by this court on theories or grounds different than those urged at the time of trial, but such cases have been the exception, rather than the general rule. *See, e.g., Agan v. U.S. National Bank,* 227 Or 619, 629, 363 P2d 765 (1961), in which this court did so, but only because the parties had been afforded a fair opportunity to be heard on the theory or ground upon which the court based its decision. A similar opportunity to be heard was also present in other recent cases decided on theories or grounds different than those urged on trial.[22]

It is unthinkable to me that because a case comes to us on petition for review from the Court of Appeals (as will soon be true of all cases) this court, by simply writing a letter to counsel asking for their views as to whether a rule as stated in some previous case should be "refined" or "reconsidered," should now feel free to decide any such case on any theory or ground, including one not suggested by any party in response to such a letter, and even though the losing party has had no opportunity to be heard before doing so. To me, such a practice strikes at the very roots of the adversary system, as well as the basic concept of "due process." Appellate judges should also not forget the justifiable frustration of a lawyer or litigant who loses a case by a decision based upon a theory or ground which had not been urged by his opponent and on which he had no opportunity to be heard.

As pointed out later (at 189) the new theory adopted by the majority as the basis for its decision in this case was not necessary to support the result reached by the majority because the same result could properly have been reached by the majority under the rule established in *Welch, Heinig* and *Woodburn.* That theory could have provided a proper basis for discussion in a

---

[22] *See Hanscom v. Irwin,* 186 Or 541, 558-59, 208 P2d 330 (1949); *Belleville v. Davis,* 262 Or 387, 400, 498 P2d 744 (1972); *State Farm Fire v. Sevier,* 272 Or 278, 299, 537 P2d 88 (1975). *See also Chaney v. Fields Chevrolet Co., supra* n. 21, dissenting opinion, at 622-24.

concurring opinion as a proposed alternative basis for the decision of these cases, for possible consideration in a future "home rule" case, such as in the companion case of *City of Hermiston v. ERB,* 27 Or App 755, 557 P2d 681, *rev on other grounds,* 280 Or 291, 270 P2d 663 (1977), when that case is again before this court on its merits. This court could then have had the benefit of briefs and arguments of counsel upon that proposal. Indeed, if it has the merit claimed for it by the majority, there is no good reason why it should not have been thus submitted to the scrutiny of the adversary process, as in the usual case. In may view, however, it is improper to adopt this new, untried and untested rule as the basis for an opinion by a bare majority of this court which so drastically changes the previously existing balance of power between the legislature and the cities in the important area of "home rule" when these cities have had no fair opportunity to be heard.

## B. *The test to be applied.*

The majority has overruled its previous unanimous holdings both in *Heinig* and in *Woodburn* that the "real test" to be applied in deciding whether a given matter is subject to exclusive power of the state or of the cities is to determine which has an interest which "predominates" over the interest of the other after a "weighing" of the interest of each. As a substitute for that simple test, the majority, based upon its holding that the purpose of the Oregon "home rule" amendments is limited to a grant of "home rule" power to cities to legislate on matters of "procedure," but not as to matters of "substance," has adopted a much more complicated formula, involving the application of wholly different concepts, which may be summarized as follows:

1. *As to "substantive" matters:*

"* * * [A] general law addressed primarily to *substantive* social, economic, or other regulatory objectives of the state prevails over contrary policies preferred by

[ 174 ]

some local governments *if it is clearly intended to do so,* unless the law is shown to be irreconcilable with the local community's freedom to choose its own political *form.* * * *" (Emphasis added) (Op 156)

2. *As to matters of "procedure."*

"* * * [A] statute * * * addressed to a concern of the state with the structure and procedures of local agencies * * * impinges on the powers reserved by the ["home rule"] amendments * * *." (Op 156)

This second rule, however, is subject to two exceptions which permit the state to still legislate as to matters of city "procedures."

(a) Whenever "the state concern" can be "justified by a need to safeguard the interests of [private] persons or entities affected by the procedures of local government." (Op 156)

and

(b) In cases involving employees of cities who are employed to operate or carry out any "process" or "procedure" of a city (as in these cases) the legislature may nevertheless enact statutes which "embody a legislative concern with * * * living standards of persons in these occupations and their families" as a "substantive, social objective," if it so desires and makes "clear" such an intent, in which event such laws will prevail over any city ordinances to the contrary. (Op 151, 156)

No direct authority is cited by the majority in support of the foregoing formula or of the various propositions and distinctions which make up that formula, other than those relied upon by the majority as the basis for its holding that the purpose of the Oregon "home rule" amendments is limited to a grant to cities of "home rule" processes on matters involving the "structure" or "procedure" of city government.

The mere statement of such a complex formula as a test for determining whether any given matter is subject to the "home rule" power of cities, free from "interference" by the state legislature, reveals again how drastically the majority has shifted the "balance of power" by a limitation of such "home rule" power to

[ 175 ]

a much smaller area than that existing for the past 40 years under the unanimous decisions by this court in *Welch, Heinig* and *Woodburn.* Under those decisions the cities had exclusive "home rule" power as to all matters of "local interest," the test of which was a determination whether the interest of the cities "predominates" over the interest of the state. Under the decision by the majority, however, the cities not only have no such "home rule" power as to any "substantive" matters, but even as to matters of city "procedure," the state can still legislate not only when there is a legitimate "state concern" over the protection of persons affected by such procedures, but also whenever the state legislature may, in its discretion, decide to enact a statute out of "concern with the living standards" of persons engaged by cities to operate or carry out city "procedure."

In addition, the mere statement of such a complex formula reveals that the majority, in abandoning the "balance of interest" test, has embarked upon "unchartered seas" and will now require the application of not only a more complicated formula, but the interpretation and application by the Oregon courts of at least equally general, but different, words and phrases, such as the following:

(1) Whether a state law is "addressed *primarily* to *substantive* social, economic, or other *objectives* of the state," as distinct from matters of "structure" and "procedure";

(2) Whether such a law was "clearly intended" by the legislature to prevail over city charters or ordinances;

(3) Whether such a law is "irreconcilable" with the freedom of a city to "choose its own political form";

(4) Whether, even if a state law is one which is found to be "addressed to a concern of the state with the structure and procedures of local government," it will nevertheless prevail because of a "state concern" which can be "justified by a need to safeguard the

interests of persons or entities affected" by such procedures; and

(5) Whether, in cases involving employees of cities, including those engaged to make operative their "procedures," the state has a legitimate "concern with the living standards" of such persons.

By way of contrast, the rule as established and recognized by this court for the past 40 years that the purpose of the Oregon "home rule" amendments was to make a grant to cities of exclusive power to legislate in local matters, without legislative interference, as held in *Welch*, and that the "test" to be applied in deciding whether any given matter is subject to that exclusive power is to determine whether the interest of the city "predominates" over that of the state, or vice versa, as held in *Heinig* and *Woodburn,* is in accord with and supported by many authorities.[23]

---

[23] *See, e.g.,* 1 Antieau, Municipal Corporation Law 3-59, § 3.21 (1975), stating that:

"* * * What is called for is an open discussion of whether the concern of the people of the entire state is greater, in a particular instance, than the concern of the local residents. This will certainly mean that even though certain large areas are ordinarily labelled one or the other, subareas therein may call for a different decision. This has been captured very well by the Oregon Court which first acknowledged that fire protection is traditionally said to be a 'state' concern, but then went on to hold that the determination of the kinds of uniforms to be worn by city firemen was a matter for the people of the municipality to decide, since they were concerned and the people of the entire state had no discernible interest in the matter."

Also of interest is the following statement from 2 McQuillin, Municipal Corporations 161-62, § 4.85 (3d rev ed 1966):

"General definitions of 'municipal affairs' and 'state affairs,' within the meaning of the rules governing legislative control of municipal corporations above outlined, have occasionally been announced in judicial decisions, although frequently courts deliberately refuse to define these terms, in order that each case as it arises may be considered upon its own facts and circumstances, without the complication of prior pronouncements upon the attributes of the one or the other category of 'affairs.' This unwillingness or inability to designate with certainty a line dividing the two classes of matters, and, indeed, the futility of attempts to do so, are clearly demonstrated by the conflicting and inharmonious decisions upon particular matters as belonging in the 'municipal' or in the 'state' class of affairs."

Again, on this state of the record, it is unfair, in my opinion, for a bare majority of this court to abandon the test as long established and recognized by this court and to completely change the "rules of the game" in such a drastic manner, and by the adoption of a complex new formula of rules, without affording to the cities of Oregon a fair opportunity to be heard before doing so. (*See* 171-174 above)

## C. *The jurisdiction of the courts.*

As previously noted, since the unanimous holding by this court in *Welch* in 1936, *all conflicts* between the state legislature and the cities of Oregon over whether particular matters are subject to the exclusive "home rule" powers of cities as matters of "local concern" have been decided by the Oregon courts.

The majority opinion recognizes (at 146) that the rule as later stated in *Heinig* "seemed to extend to all conflicts of state and local policy," but goes on to hold that "we do not think that article XI, section 2, extends that far." The majority then holds (at 147) that the jurisdiction of the courts in "home rule" cases extends only to cases involving disputes between the state legislature and cities over "the processes of city government," because such cases involve a consideration of "comparable interests—the citizens' interests in responsible government, in elections, in official accountability, in the procedures of policy planning and

---

*See also* 2 McQuillin, *supra,* § 3.87.

Decisions by other courts are of limited assistance because of differing constitutional provisions for "home rule." It appears, however, that the "predominate interest" test, as adopted by this court in *Heinig,* is consistent with the test adopted in other states with similar constitutional provisions for "home rule." *See, e.g., Apodaca v. Wilson,* 86 NM 516, 525 P2d 876, 881-82 (1974); *City of Tucson v. Tucson Sunshine Climate Club,* 64 Ariz 1, 164 P2d 598, 602 (1945); *Michelson v. City of Grand Island,* 154 Neb 654, 48 NW2d 769, 775 (1951); *Moore Funeral Homes, Inc. v. City of Tulsa,* 552 P2d 702, 704 (Okla 1976); *State ex rel Brelsford v. Retirement Board,* 41 Wis 2d 77, 163 NW2d 153, 157 (1968); *City of Joplin v. Industrial Commission of Missouri,* 329 SW2d 687 (Mo 1959).

*See also* Sharp, *Home Rule in Alaska: A Clash Between the Constitution and the Court,* 3 UCLA-Alaska L Rev 1, 51 (1973).

decision, taxing and borrowing, and the like," and that the jurisdiction of the courts no longer extends to cases involving disputes over what it describes (at 148) as "competing policies" for the reason that "such choices are the essence of political, not judicial, decision." Based upon this reasoning, the majority holds (at 147) that the Oregon "home rule" constitutional amendments must be so interpreted because:

> "* * * Judicial interpretations of such a provision must strive to articulate these directives and avoid formulations that give no guidance to government and leave every policy dispute to judicial decision."

and because

> "* * * [W]hen such a challenge does reach a court, the court's decision must be derived from a constitutional standard, not from the court's own view of competing public policies. * * *"

Although these statements may represent the political philosophy of the writer of the majority opinion, to me they are little more than rhetoric. The courts frequently apply a "balancing test" of weighing competing social interests under constitutional provisions which provide no more of a "standard." Examples, among others, are to be found in cases in which the courts must balance the interests of individuals as against the interest of the state in cases involving claims by individuals to freedom of speech,[24] to equal protection of the laws,[25] to an administrative hearing,[26] and to an abortion,[27] to mention but a few. Also, the problem confronted by the courts under the "balancing of interest" test as stated in *Heinig* and approved in *Woodburn* is no more difficult of application than the "fairness" test as adopted by this and

---

[24] *United States v. O'Brien,* 391 US 367 (1968); *Deras v. Myers,* 272 Or 47, 54, 535 P2d 541 (1975).

[25] *Shapiro v. Thompson,* 394 US 618 (1969); *Olsen v. State of Oregon,* 276 Or 9, 20, 554 P2d 139 (1976).

[26] *Mathews v. Eldridge,* 424 US 319 (1976); *Tupper v. Fairview Hospital,* 276 Or 657, 556 P2d 1340 (1976).

[27] *Roe v. Wade,* 410 US 113 (1973).

[ 179 ]

other courts in cases involving the application of state "long arm" statutes,[28] in the balancing of competing interests in child custody cases involving conflicts of competing state jurisdiction,[29] or in negligence cases in which the "continuum" test is sometimes applied.[30]

Although the majority professes to find in "the citizens' interests in responsible government, * * *" a more definite standard of "comparable interests" for application in cases involving processes of local government, I fail to understand how that purported standard is more definite than a consideration of "local interest" and "state-wide" interest in cases involving substantive matters. In any event, "citizens' interests in responsible government * * *" does not provide a "constitutional standard," as stated by the majority to be required, much less a standard based upon any language in the Oregon "home rule" amendments. (*See* 162, above.)

By its unanimous decision in *Heinig* this court recognized that:

> "* * * It has been said that 'The question of which level of government should provide a given service is essentially a political one and should be determined by the political agencies of the government.' * * *" (231 Or at 483)

but went on to hold that:

> "* * * [U]nder the theory of home rule which we have adopted there are involved two political agencies making conflicting claims to sovereignty, and the resolution of that conflict must be made by the courts." (231 Or at 483-84)

---

[28] *International Shoe v. Washington,* 326 US 310 (1945); *Wakeman v. Davis,* 271 Or 414, 416, 532 P2d 796 (1975).

[29] *Hawkins v. Hawkins,* 264 Or 221, 239-40, 504 P2d 709 (1972).

[30] *Stewart v. Jefferson Plywood Co.,* 255 Or 603, 608, 469 P2d 783 (1970).

This is in complete accord with the thinking and writing of many authorities.[31] This view is also in accord with the following classic statement by Chief Justice Marshall in *Cohens v. Virginia,* 19 US (6 Wheat.) 264, 404 (1821):

> "* * * The judiciary cannot, as the legislature may, avoid a measure because it approaches the confines of the constitution. We cannot pass it by because it is doubtful. With whatever doubts, with whatever difficulties, a case may be attended, we must decide it if it be brought before us. * * *"

Indeed, the view previously held by this court that it is for the courts to decide whether any particular matter is a matter of "local concern," so as to be subject to the exclusive "home rule" power of a city, is the generally accepted rule, as recognized by most authorities.[32] Under the rule as stated in *Heinig* such decisions are to be made by identifying the interest of the city and that of the state in the matter which is the

---

[31] As stated in Sandalow, *The Limits of Municipal Power Under Home Rule: A Role for the Courts,* 48 Minn L Rev 643 (1964) (cited with approval by the majority (at 3) on another point), it is stated (at 688) that:

> "* * * *Characterization of the issues as political, upon which all can agree, does not establish the wisdom or necessity of denying the judiciary a role.* The question to be answered is not whether an issue is political, for courts are regularly charged with the responsibility of deciding political issues, but whether it is the type of political issue toward the resolution of which the courts can make a contribution." (Emphasis added)

and (at 721):

> "Inevitably, the role suggested for the courts requires the exercise of judgment—and self-restraint—on their part. The argument that judges ought not to be entrusted with the responsibility of identifying basic values, however, is not lacking in irony in view of their generally accepted power to invalidate legislation on constitutional grounds. A community which trusts its judges to review all legislation for consistency with the constitution confers no greater power on them by authorizing the invalidation of novel municipal powers inconsistent with basic values, whatever the ambiguity of that phrase. * * *"

To the same effect, *see* Vanlandingham, *Constitutional Home Rule Since the AMA (NLC) Model,* 17 Wm and Mary L Rev 1, 27, 31 (1975).

[32] *See* 2 McQuillin, *supra* n.23, § 4.88, and cases cited therein; and 1 Antieau, *supra* n.23, § 3.21, and cases cited therein.

*See also* Vanlandingham, *supra* n.6, at 1; Bromage, *Home Rule—NML Model,* 44 Nat'l Mun Rev 132, 136 (1955).

[ 181 ]

subject of any given case and by determining whether the interest of the one "predominates." Although "competing social policies" may sometimes be involved, the primary focus is upon the identification of the interest of the city and that of the state and the balancing of such interests.

It may be admitted that this may not be a perfect test and that its application in some cases may not be easy. But, as stated by Chief Justice Marshall, because cases may present difficulties is not a good reason for the courts to decline the exercise of jurisdiction. Indeed, to do so as the majority has done in this case, is not only to abdicate the jurisdiction of all Oregon courts over all "home rule" cases involving matters of substance, but is to "throw out the baby with the bath water" because the "bath water" is too "hot."

Again, the majority of this court has taken this drastic step despite the fact that no such contention is made by any party to these cases—all of which recognize the jurisdiction of this court to decide this case and that the basic issue to be decided is whether these two statutes involve matters of predominantly "local interest." It is not only unfair, but irresponsible, in my opinion, for a majority of this court to abdicate its jurisdiction to decide disputes between cities and the state legislature in all "home rule" cases involving "substantive matters," at least without first affording to the cities a fair opportunity to be heard upon a matter of such importance to them.

D. *The power of the state legislature*

As previously noted, since the unanimous holdings by this court in *Welch* in 1936 and in *Heinig* in 1962, it has been established that because the grant to cities of "home rule" powers emanates from the Oregon Constitution, the state legislature has no power to interfere with the exercise of such powers by either general or special laws and that, as a corollary, all disputes over claims of exclusive power by the state legislature over matters claimed by cities to be within these

exclusive "home rule" powers are to be resolved by the courts.

The majority has held, however (at 146, 148 and 156), that the Oregon courts have no jurisdiction except in cases involving "processes" of local government, and that, as a corollary, in all cases involving matters of "substance," the "pursuit" by the state legislature of "its statewide social objective undeniably displaces the arrangements (or absence of arrangements) preferred by the local government." In other words, the state legislature now may enact whatever general laws it may please to enact in all matters of "substance," despite appeals by cities to the Oregon courts that such laws invade their exclusive "home rule" powers.

Thus, in effect, the majority has adopted a rule of "legislative supremacy" in all cases involving matters of "substance." This also includes cases such as this, in which city employees engaged to make operative the "processes of local government" are held by the majority (at 151 and 154) to be a proper subject of a state "concern" as a "social objective" and as a matter of "substantive policy."

As previously noted, state home rule constitutional provisions are of two general types: (1) those granting to cities "local autonomy," with exclusive power to legislate as to "local matters" and (2) those under which the "home rule" power of cities to legislate is subject to "legislative supremacy" by the enactment of general state laws. In effect, the holding by the majority that cities have exclusive "home rule" powers in the limited area of "procedure," while the state legislature still has "supremacy" in the broader area of "substance" is a "hybrid" based solely upon the holding by the majority that such was the intended purpose of the Oregon "home rule" amendments—a holding without basis either in precedent or in the terms of such amendments.

[ 183 ]

Again, as previously noted, this court held unanimously in *Welch* that under the terms of the Oregon "home rule" amendments the legislature has no power to "intermeddle" by general law in matters of "local concern." In so holding, this court adopted a view in accord with the views of many authorities to the effect that to adopt a rule of "legislative supremacy" is to make home rule powers depend solely upon "legislative grace" and that if the purpose of home rule is to grant cities freedom from interference by the state legislature it is hardly advisable to make the state legislature the "arbiter" of the state's disputes with the cities in such matters.[33]

And, again, the majority has adopted its rule of "legislative supremacy" over all "substantive" matters, despite the fact no such contention has been made by any of the parties in these cases and without affording to these cities a fair opportunity to be heard before the adoption of a new rule resulting in such drastic consequences to them. (*See* 171-174 above)

---

[33] Kratovil & Siegweid, *Illinois Municipal Home Rule and Urban Land—A Test Run of the New Constitution,* 22 DePaul L Rev 359, 361 n.7 (1972); Note, *Home Rule: A Solution for Municipal Problems?,* 16 Wyo LJ 47, 62 (1961).

As stated by another writer, in criticizing the rule of "legislative supremacy" under some state home rule constitutions,

"* * * If the states had deliberately set out to destroy the grass roots of democracy, they could hardly have invented a more effective device for doing so than the system of legislative tutelage which many of them employ." Mott, *Strengthening Home Rule,* 39 Nat'l Mun Rev 172 (1950).

To the same effect, as stated by still another writer:

"Historically, the state legislature, jealous of its legislative prerogatives, seldom has been an ardent advocate of home rule. * * *" Vanlandingham, *supra* n.6, at 22.

Again, to the same effect:

"One of the major objectives of home rule is to prevent legislative interference with local government. * * *

"* * * Government by remote control is seldom satisfactory government. And when the government agency is a legislature in which the cities have but minority representation, its evils grow like the green bay tree. * * *" Mott, Home Rule for American Cities, American Municipal Association 11 (1949).

E. *Application of the test in this case.*

Instead of applying the test established in *Heinig* and *Woodburn* of seeking to identify and to "weigh in the balance" the interest of the city and that of the state in subject matter of ORS 237.610-237.640 and ORS 243.005-243.055, the analysis used by the majority in applying its new test (at 149) is to consider whether these statutes are "addressed primarily to a concern of the state with the modes [procedures] of local government or to *substantive* social, economic, or other regulatory objectives."

The conclusion reached by the majority (at 156), after the application of this test is that these statutes are "of the second, substantive kind." The basis upon which that conclusion appears to rest is the holding by the majority (at 151) that the statutes "embody a legislative concern with securing the postemployment living standards of persons in these occupations" (policemen and firemen), but that "[i]t is not essential to the legitimacy of this goal whether the legislature singled out police officers and firemen"; and that (as held at 156) these statutes "address a social concern with the living standards of these classes of workers" and that "[v]arious categories of employees are not placed beyond the reach of the state's social legislation merely because their occupational functions * * * happen to be found in the public sector of local government."

In reaching this result the majority (at 151) would also distinguish the previous decisions of this court in *Branch v. Albee,* 71 Or 188, 142 P 598 (1914), and in *State ex rel Heinig v. City of Milwaukie et al,* 231 Or 473, 373 P2d 680 (1962). In *Branch* this court held invalid a state law requiring all cities with a population over 50,000 to establish a board of pensions and a pension fund for police officers and to pay them retirement benefits equal to one-half of their salaries upon retirement at age 60 after serving for 20 years, upon the ground that under the Oregon "home rule"

[ 185 ]

amendments to Art XI, § 2, and Art IV, § la, the matter of pensions for policemen employed by a city was a "municipal" matter and that Art IV, § la, conferred upon the voters of cities "full power to legislate for themselves as to all local, municipal matters." (*See* 71 Or at 198 and 205) In *Heinig* (at 481) this court expressly reaffirmed *Branch* and held invalid a state statute which undertook to create municipal civil service commissions to supervise civil service systems for firemen and noted that there was "no substantial difference between the establishment of a pension system for city police [as in *Branch v. Albee,* 71 Or 188, 142 P 598 (1914)] and the establishment of a civil service system for city firemen."

The principal ground upon which the majority would distinguish *Branch* and *Heinig* (at 152) is that the statutes involved in those cases undertook to create "agencies of local government" and that a law which "would have displaced the authority of the politically accountable local officials over the selection, assignment, discipline, and replacement" of city employees "by direction from the state" is "a substantially different interference with local self-government from an obligation to provide a measure of economic security to public employees."

It follows from the rationale of the majority opinion that the state legislature has the power to enact similar statutes under which cities would be required to provide pension benefits, including a $10,000 life insurance policy, to all of its "citizens" employed by all cities and counties, including janitors, typists, clerks, librarians, swimming pool attendants and park maintenance employees.

It may be true that the statutes involved in these cases do not *require* cities to establish new or different "agencies of local government." However, the effect upon the operation of city government of the rationale adopted by the majority as the basis for its opinion is equally drastic. Instead, the cities are required by ORS

237.620(1) to "become participants" in the state Public Employes' Retirement System with respect to "police officers and firemen employed by them." The fact that cities are thus required to "participate" in an existing state "agency," rather than to "establish" a new "agency of local government" can hardly provide a proper basis to support the conclusion by the majority that these statutes do not involve matters of "procedure" or "structure" of government, but instead involve matters of "substance." Also, a pension plan is as much a "process" and "procedure" of city government as is a civil service system.

Moreover, even as to the "processes" and "procedures" of city government, a city can perform and make operative such "processes" and "procedures" only through employees employed by them for that purpose. If a city is to have "home rule" even in this limited area it must have full control over such employees, including the right to hire and fire and to fix the consideration to be paid them. When the state undertakes to fix the compensation, including both wages and "fringe benefits," such as pensions and life insurance, which must be paid by cities to employees, its interference with the "processes" and "procedures" of city government is fully as serious as under state laws which would interfere with the "selection, assignment, discipline and replacement" of such employees—an interference which, according to the majority opinion (at 152) would be improper. On the contrary, the state would appear to have a greater interest in the "selection" and "discipline" of city police officers engaged in the enforcement of state laws than in the particular amount of compensation to be paid to such officers, much less in a requirement that cities purchase $10,000 life insurance policies for the beneficiaries of all police officers.

As previously stated by a unanimous court in *Heinig,* with reference to state laws interfering with employment and discharge of city employees:

[ 187 ]

"* * * If the legislative assembly has the power to deprive the people of municipalities of self-government in this respect, it would be difficult to imagine an area of activity engaged in by the city which could not be similarly controlled." (231 Or at 485)

The state's interest in the amount of wages paid by a city to its employees is different than the interest of the state under statutes requiring that employees be covered by workers compensation, wage and hour standards, safety standards, nondiscrimination, or child labor laws, which are contended by the majority (at 153) to involve "statewide social objective[s]" comparable to those contended by the majority to support the validity of these statutes. All of those statutes involve "statewide social objective[s]" in establishing *minimum* standards for *all* employees, *whether public or private.* These statutes, by contrast, do not require cities to provide pension benefits and a $10,000 insurance policy for *all* employees, whether public or private, but only for city employees and, indeed, only for city police officers and firemen. Moreover, the required pension benefits and $10,000 insurance policy can hardly be properly characterized as a "minimum" standard, at least in the same sense as provided under statutes requiring payment of minimum wages.[34]

Indeed, except in times of national emergency, neither federal nor state government may undertake to regulate the amount of wages that must be paid by either private or public employees, except to establish a minimum wage for common labor. In *National League of Cities v. Usery,* 426 US 833 (1976) (at 851), it was held by the United States Supreme Court that the Fair Labor Standards Act does not extend to employees of cities and states because Congress has no

---

[34] Indeed, the brief filed in these cases on behalf of defendant Public Employes' Retirement Board, expressly recognizes that statutes providing for workers' compensation and unemployment benefits involve "areas of statewide social concern relating to all employees, whether public or private."

power to control compensation paid by cities and states to their employees in view of their "separate and independent existence." Moreover, no precedent is cited by the majority to support its holding that a state may require public employers (much less private employers) to provide a $10,000 in life insurance for their employees, either as a "minimum" or otherwise.

On the other hand, even under the test as previously adopted by this court in *Heinig* (and now repudiated by the majority) it is arguable that state laws requiring the payment of pensions to police officers and firemen may be held valid upon the ground that the interest of the state in the protection of its citizens by proper police and fire protection requires the payment of wages, and including such "fringe benefits" sufficient to attract and retain qualified policemen and firemen. In *Heinig* it was stated (at 488):

> "* * * Each case requires a weighing of the state's interest against the interest of the municipality. In some instances the need for uniformity, or the benefit of a widespread application of the law, or the recognition that the matter dealt with is interrelated with other functions of the state and similar considerations will require that the statute have preference over the charter; * * *."

Indeed, although the cases are not without conflict, there are decisions by courts of other states holding that state laws requiring pension benefits for policemen and firemen involve such an interest of the state so as to prevail over that of the cities which employ them.[35]

The majority is also critical of the *Heinig* test in stating (at 153, 154) that it is not "generally useful to define a *'subject'* of legislation and assign it to one or the other level of government," because to do so "misconceives the nature of a 'state interest' to focus

---

[35] *See* 2 McQuillin, *supra* n.23, § 4.106, and cases cited therein, and 1 Antieau, *supra* n.23, § 3.25, and cases cited therein. *Cf. State ex rel Brelsford v. Retirement Board,* 41 Wis 2d 77, 163 NW2d 153 (1968).

narrowly on the functions performed by particular groups of employees to the exclusion of a concern with the employees as citizens." Thus, according to the majority (at 154), "the legislature may, if it so chooses, consider the interest of those who perform the job as well as the interests of those dependent on that performance."

This rhetoric is unclear, at least to me. While the majority may not consider it "useful" to consider problems of "home rule" in terms of the "subject," "subject matter" or "matter" of the legislation involved, such an approach to these problems is not only implicit in *Heinig,* but is the approach taken by many other courts and by other recognized authorities. *See, e.g.,* 2 McQuillin, Municipal Corporations §§ 4.89 to 4.113 (3d rev ed 1966), and 1 Antieau, Municipal Corporation Law §§ 3.22 to 3.34 (1975), and the numerous cases cited therein.[36]

Also, according to the majority (at 153, 154), "[a] search for a predominant state or local interest in the 'subject matter' of legislation can only substitute for the political process to which we have referred the court's own political judgment whether the state or the local policy should prevail." This view, again, is a corollary of the political philosophy that the courts should abdicate to the legislature all responsibility in all cases involving what the majority refers to as matters of "substance," as previously discussed. (*See* 179)

---

[36] As stated in 2 McQuillin, *supra* n.23, § 4.28:

"* * * Generally, except where otherwise provided by the constitution, matters of purely local concern are exempt from conflicting state legislation, but state laws control as to matters not purely of local concern, generally referred to as state affairs."

and, at § 4.78:

"So far as legislative control is concerned, state constitutions, state statutes, municipal charters, and decisions of the courts often employ, without definition, various terms to distinguish between (1) matters principally pertaining to the state at large, and (2) matters of purely local concern. * * *"

To the same effect, *see* 1 Antieau, *supra* n.23, §§ 3.21 to 3.40.

Indeed, the majority itself engages (at 147) in much the same analysis when it undertakes to list as "processes of city government" still subject to city home rule powers the following: "elections," "official accountability," "procedures of policy, planning and decision," "taxing and borrowing," "and the like."

Thus, because (as demonstrated above at 189), the same result could be reached upon application of the test previously established by this court in *Heinig* and *Woodburn,* it becomes obvious that what the majority has done has been to use these cases as a vehicle for the adoption of new concepts and new tests which have drastic consequences in limiting the area of home rule left to the cities, despite the fact that they have not had a fair opportunity to be heard on these most important matters.

Indeed, the majority opinion may properly be characterized, in my view, as a "judicial *tour de force.*"[37]

III *The financial impact upon cities of the rule of "legislative supremacy."*

Wholly aside from its finespun legal theory, and wholly as a practical matter, the majority opinion is simply "bad law," in my opinion. What the majority has done in adopting a rule of "legislative supremacy" as to all substantive matters, i.e., all matters which the legislature may deem to involve "societal policy," is to enable the legislature to require the cities of Oregon to adopt expensive social programs without being responsible for any part of the cost of such programs and without recourse to the courts in the event of "jurisdictional disputes." This would also appear to be true as to the counties of Oregon, according to the reasoning of the majority and the reference in its opinion (at 147) to counties.

---

[37] *See* Linde, *Without "Due Process,"* 49 Or L Rev 125 (1970), in commenting (at 125) that previous decisions by this court on "constitutional litigation" cannot properly be characterized as "startling judicial tour[s] de .force."

Indeed, it is a matter of common knowledge that the "lion's share" of the cost of the operation of a city government consists of wages, salaries and other compensation paid to its employees. It is also a matter of common knowledge that overextended pension benefits for the employees of a city may seriously endanger the financial solvency of a city, with its more limited sources of income, thereby putting in jeopardy its ability to perform any of the functions necessary for the protection and welfare of its inhabitants— witness the recent experience in New York City.

As stated by one writer:

> "The most pernicious feature of the doctrine of state supremacy over cities is the tendency of the legislature to lay burdens on the cities.[38] * * *"

The impact upon the cities is compounded because the legislature also in 1973, enacted ORS 243.650 et seq. which guarantees to all city employees the right to bargain collectively and provides for binding arbitration in the event that cities and the representatives of their employees are unable to agree on the compensation to be paid to such employees, including "fringe

---

[38] Mott, *supra* n.33, at 46-47. *See also* 48-49.
As also stated by the same writer:

> "* * * If a legislature were to levy a tax directly on the cities the public objection would be tremendous. But when a police pension bill is before the legislature the opposition may not be able to make itself heard. The policemen's organization maintains a powerful lobby and the public usually fails to see the effect of the law on the local budget. Furthermore, the legislature by passing this bill can please a special group of voters without being required to levy the taxes necessary to pay the costs. Sound public finance requires that the same agency which orders the expenditure be responsible for raising the money.
> "* * * * *
> "It is time to recognize that our cities have come of age, that they are equal partners in the gigantic business of government in America, and that our democractic institutions can be strong only if our local communities are given full responsibility for managing their own affairs. * * *" Mott, *Strengthening Home Rule,* 39 Nat'l Mun Rev 172, 177 (1950).

*See also* Vanlandingham, *supra* n.6, at 20, and Witt, *State Regulation of Local Labor Relations, The Demise of Home Rule in California?,* 23 Hastings LJ 809, 816 (1972).

benefits" such as pensions and insurance. Thus, under the rule of "legislative supremacy," the union representing city employees gets "two bites of the apple": first, by collective bargaining, including binding arbitration, and then, if unable to secure its objectives by those means (perhaps because of the high cost to the cities involved) by going to the state legislature for legislation on such matters, as matters of "societal policy," with responsibility on the cities to provide funds to pay for the cost of such legislation, and without hope by the cities of appeal to the courts for protection. The majority has nevertheless adopted that rule without affording to the cities a fair opportunity to be heard.

As previously noted, this court held in *Heinig* that in determining whether a given matter is one of "local concern," so as to be within the exclusive "home rule" powers of a city, the test is to determine whether the interest of the city or the interest of the state "predominates." Under that test, whether the city or the state is to pay the cost of a program, and its financial impact upon the city or state, would be at least one important factor to be considered by the court in deciding whether a given statute is valid or invalid as an invasion of the constitutional "home rule" power of a city.

Under the newly adopted rule, however, the legislature is left free, despite the "home rule" amendments to the Oregon Constitution, to adopt any statute involving any matter which it deems to be one of "societal policy," regardless of the cost imposed upon cities, without recourse by them to the courts, and without even a fair opportunity to be heard in these cases before the adoption of that new and drastic rule by a bare majority of this court.

The majority opinion, in my judgment, makes a mockery of the "home rule" amendments to the Oregon Constitution, under which the "home rule" grant to cities is subject only to "the constitution and

*criminal* laws" of the state and initiative powers are reserved to the voters of cities "as to *all local, special and municipal legislation of every character.*" It also leaves Oregon cities and counties with no complete remedy other than a campaign for the adoption of an initiative measure to amend the "home rule" provisions of the Oregon Constitution by provisions which may more clearly grant "home rule" to cities and counties over matters of local concern—an action which might well carry with it some hazard to legitimate and "predominating" interests of the state as a whole.

For all of these reasons, I am compelled to dissent from the opinion by the majority. Rather than attempt to summarize a dissenting opinion that is already too long, reference is made to the summary set forth at the beginning of this dissent.

**HOWELL, J.,** dissenting.

I join in the dissent of my colleague, Justice Tongue, except that I do not subscribe to parts of the rhetoric used in the dissenting opinion.

**BRYSON, J.,** dissenting.

I concur in the dissenting opinion of Justice Tongue wherein it would adhere to the policy and rule of law enunciated in *State ex rel Heinig v. Milwaukie et al,* 231 Or 473, 373 P2d 680 (1962). In *Heinig* the state legislature enacted law requiring the home rule city to provide a civil service system for firemen. This court held it could not do so. We further held:

> "* * * To be sure, it could be shown that the manner of dealing with personnel of local fire departments may have some relation to the affairs of the state outside of the city boundary—in a sense all events in life are related—but the question requiring our answer is whether the extramural effect is substantial or significant. * * *

"* * * The question is, of course, one of degree, and the allocation of power between legislature and municipality must be made by us in accordance with the purpose, as we understand it, of the constitutional amendments which vested in the cities a part and an exclusive part of the power to legislate free from control of the state legislative assembly.

"That purpose, stated broadly, was to make operative the concept that the closer those who make and execute the laws are to the citizens they represent the better are those citizens represented and governed in accordance with democratic ideals. That objective would not be served if we should decide that the legislative assembly pre-empts the field each time it makes a statute applicable to all cities alike." 231 Or at 481-82. (Footnotes omitted.)

I also dissent from the majority opinion because it allows and encourages a violation of the Oregon constitutional and statutory provisions relating to real property taxes.

In this case the legislature enacted laws requiring that city police officers and firemen be brought under the state Public Employes Retirement System law or that the municipality provide an equal or better system. ORS 237.610-237.640. It also enacted statutes to provide life insurance for police officers and firemen. ORS 243.015 provides:

"* * * [T]he Department of General Services shall enter into a contract with an insurance company licensed to do business in this state to purchase insurance as described in ORS 243.025 for all police officers and firemen in the service of public employers."

ORS 243.035 provides:

"(1) The premiums and administrative costs incurred by the Department of General Services for the insurance provided for in ORS 243.005 to 243.045 shall be paid by the affected public employers and shall not come from funds of the Public Employes' Retirement System.

"(2) Every public employer shall include in its budget amounts sufficient to pay the annual premiums accruing on the policies of insurance issued pursuant to ORS

[ 195 ]

243.005 to 243.045, and amounts sufficient to reimburse the Department of General Services for its administrative expenses incurred under ORS 243.005 to 243.045."

In other words, the state legislature is directing the city employer to include in its budget, and subsequently on the tax roll, an item to pay annual premiums.

ORS 291.342 and 291.344 together with ORS 311.657 and 311.658 provide for a state property tax to be collected through the counties and to be paid to the state treasury to insure payment of bonded indebtedness, interest and deficit. However, ORS 311.660(1) specifically provides:

"(1) The State of Oregon shall not for any fiscal year collect a state property tax, either directly or by apportionment among the several counties, in any greater amount than it may be necessary to collect by means of such a property tax for that year to pay bonded indebtedness or the interest thereon."

Under ORS 311.660 the state clearly could not enact a pension and insurance program for local employees of the city of LaGrande and the city of Astoria by ordering the local cities to place the cost of these items in their budget. When the item is placed in the local cities' budgets, it becomes a tax levy on real property. By ordering the local governments to fund such a program in the above manner, the state has indirectly levied property taxes for that purpose since the property tax is the chief source of revenue for local governments, and in many instances of small cities it is the sole source of revenue. The state is thus doing indirectly what the statute specifically forbids it to do directly. Such legislation here involved also violates Article XI of the Oregon Constitution:

"Section 11. Tax limitation. (1) Except as provided in subsection (3) of this section, no taxing unit, whether it be the state, any county, municipality, district or other body to which the power to levy a tax has been delegated, shall in any year so exercise that power to raise a greater amount of revenue than its tax base as defined in subsection (2) of this section. The portion of any tax

[ 196 ]

levied in excess of any limitation imposed by this section shall be void.

"(2) The tax base of each taxing unit in a given year shall be one of the following:

"(a) The amount obtained by adding six percent to the total amount of tax lawfully levied by the taxing unit, exclusive of amounts described in paragraphs (a) and (b) of subsection (3) of this section, in any one of the last three years in which such a tax was levied by the unit; or

"(b) An amount approved as a new tax base by a majority of the legal voters of the taxing unit voting on the question submitted to them in a form specifying in dollars and cents the amount of the tax base in effect and the amount of the tax base submitted for approval. The new tax base, if approved, shall first apply to the levy for the fiscal year next following its approval.

"(3) The limitation provided in subsection (1) of this section shall not apply to:

"(a) That portion of any tax levied which is for the payment of bonded indebtedness or interest thereon.

"(b) That portion of any tax levied which is specifically voted outside the limitation imposed by subsection (1) of this section by a majority of the legal voters of the taxing unit voting on the question.[1]

"* * * * *."

Pursuant to the above, if the state desired to mandate certain items of payment, such as premiums for police and firemen insurance policies, it must provide the funds to do so. This could be done out of the general fund or it could provide a state "tax base" and levy a state general tax, but if it was outside of the six percent limitation it would have to obtain the voters' approval. The state, in enacting the legislation objected to in this case, has not followed this statutory and constitutional procedure. Instead, it has taken advantage of the local governments' tax bases and other property tax machinery to fund state mandated

---

[1] Adopted originally by people at general election in 1916; amended in 1932 at general election; present language adopted by voters at general election of 1962.

programs. In other words, the state is doing indirectly what the constitution says it cannot do directly without following specified procedures.

The "home rule" Oregon constitutional provisions[2] were adopted by the people as a limitation on the legislature's original "legislative supremacy."

The rule of "legislative supremacy," with its financial impact on cities, as adopted by the majority, is also contrary to the law generally in "home rule" states. As stated in 2 McQuillin, Municipal Corporations 248-50, § 4.159 (3d ed 1966):

> "*In the absence of constitutional prohibition,* the legislature may compel a municipal corporation, without its consent, to incur debts or assume obligations as to matters of public concern such as relate to the performance of functions by the municipal corporation as the agent of the state, * * * and this includes obligations for the promotion of the general welfare and security of the state and community * * *.

> "The nature and purpose for which the debt or liability is to be incurred, i.e., whether relating to a state or municipal purpose, ordinarily determine whether the legislature may compel a municipality to act. * * *" (Emphasis added; footnotes omitted.)

In "home rule" states, however, the rule is otherwise, as stated by McQuillin in § 4.160 at 251.

> "* * * [T]he legislature cannot compel the city to incur a debt or make an expenditure or levy a tax for a strictly local interest or purpose. * * *"

---

[2] Article IV, Sec. 1:

"* * * * *.

"(5) The initiative and referendum powers reserved to the people by subsections (2) and (3) of this section are further reserved to the qualified voters of each municipality and district *as to all local, special and municipal legislation of every character in or for their municipality or district.* The manner of exercising those powers shall be provided by general laws, but cities may provide the manner of exercising those powers as to their municipal legislation. * * *" (Emphasis added.)

Article XI, Sec. 2:

"* * * The legal voters of every city and town are hereby granted power to enact and amend their municipal charter, subject to the Constitution and criminal laws of the State of Oregon * * *."

Alternatively, as stated by another writer:

"* * * If a matter strictly concerns the state, there is no reason why the city should finance it, in whole or in part. To require the city to do so is a serious invasion of local autonomy." Mott, Home Rule for American Cities, American Municipal Association 9 (1949).

In *City of Portland v. Welch,* 154 Or 286, 296, 59 P2d 228 (1936), the court stated:

"* * * [I]t should be borne in mind that the subject matter of the general legislative enactment must pertain to those things of general concern to the people of the state. A law general in form can not, under the constitution, deprive cities of the right to legislate on purely local affairs germane to the purposes for which the city was incorporated.

"Since the late Chief Justice McBride was one of the principal framers of the Home Rule Amendments (Article XI, § 2, and Article IV, § 1a) he undoubtedly knew the interpretation intended to be placed upon them. In *Pearce v. Roseburg,* 77 Or. 195 (150 P. 855), he said that he considered it 'settled in this state that as to matters purely municipal the state legislature can not intermeddle by either general or special legislation, although as to matters affecting the people generally the power of the legislature is still unlimited'. While it is true that the result reached in this case was in keeping with *Kalich v. Knapp,* 73 Or. 558 (142 P. 594, 145 P. 22, Ann. Cas. 1916 E, 1051), which was later overruled, the principal [sic] above announced has never been repudiated by this court. It is as wholesome today as it was 20 years ago when it was first declared as it undoubtedly is in keeping with the purpose and object of the Home Rule Amendments. Such interpretation perpetuates local self-government, yet does not disturb the sovereignty of this state."

More recently, in *Olsen v. State of Oregon,* 276 Or 9, 554 P2d 139 (1976), involving the validity of the Oregon system of school financing, this court discussed and approved the concept of "local control" as follows:

"*The local control argument is generally based upon the political principle that the governmental body supplying the funds, despite initial protestations to the contrary, ultimately directs how the funds shall be spent.*
"\* \* \* \* \*.

"\* \* \* In Oregon, as well as most states, local government has raised funds locally to furnish services that are provided by local government. Examples of such service are police and fire protection, streets and certain utilities. At least some of these services must be placed in the 'important' category. If the state's primary reliance on local taxes to fund education is unconstitutional, its primary reliance on local taxes to fund some of these other services would seem to be equally violative of the Equal Protection Clause. Yet this tradition of local government providing services paid for by local taxes existed at the time of statehood and continues to be a basic accepted principle of Oregon government.

"*In Oregon this emphasis on local control is constitutionally accentuated.* Art XI, § 2, and Art VI, § 10, of the Oregon Constitution provide for home rule by cities and counties; that is, the voters of the cities and counties can enact their own charters which shall govern on matters of city or county concern." (Emphasis added.) 276 Or at 23-25.

This certainly includes the amount of taxes to be levied on local real property.

The rule laid down by the majority opinion adopts the theory of "legislative supremacy." This was the state of the constitutional law prior to adopting the "home rule" provisions in the constitution. Therefore, it is difficult to conceive what the voters accomplished in adopting the home rule provisions if interpreted in accordance with the majority opinion.

It is common knowledge that local governments are now near the end of their financial resources. Budgets outside the six percent limitation are submitted to the voters two and three times before some are passed—some are never approved. As a result, local governments must stay within strict budgetary limits. The problems presented in this case would not arise if the

state would provide financing to fund its mandated programs, but as long as the state, under the majority opinion, has the power to require the local governments to fund state mandated programs, this inequity will probably continue. The state gets the credit for the programs—sometimes enacted by heavy lobbying—and the local government and property owners or renters pay the bill.

Woe will be the day when the citizens who pay real property taxes realize why their local taxes keep rising—as a result of state mandated legislation. Their indignation will be vented against such legislative action requiring further taxation and higher taxes on local real property. If the legislature desires to enact legislation to provide benefits for one group of citizens it must pay for the same from the general fund.

For all of the above reasons, I dissent from the majority opinion and would affirm the circuit court judges and the Court of Appeals, which held the aforementioned legislation unconstitutional.